# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2014-CA-00551-SCT

*HENRY ROOP*

*v.*

*SOUTHERN PHARMACEUTICALS*
*CORPORATION, GLEN LINGLE AND DOUGLAS*
*E. MARTIN*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/07/2014 |
| TRIAL JUDGE: | HON. JAMES T. KITCHENS, JR. |
| TRIAL COURT ATTORNEYS: | JIM WAIDE |
| | SCOTT W. COLOM |
| | JACK H. HAYES, JR. |
| | ADAM G. RABINOWITZ |
| | BEVERLY A. POHL |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JIM WAIDE |
| | SCOTT W. COLOM |
| ATTORNEYS FOR APPELLEES: | JACK H. HAYES, JR. |
| | BEVERLY A. POHL |
| | ADAM G. RABINOWITZ |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND REMANDED - 04/07/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., KITCHENS AND COLEMAN, JJ.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1.     Henry Roop sued Southern Pharmaceuticals Corporation ("SPC") and its principal

owners, individually, claiming he has been terminated for reporting illegal activity, namely

a kickback scheme to be carried out through a straw employee. SPC countered that it fired

Roop for, among other things, not meeting his contract goals for the year. A jury found SPC wrongfully terminated Roop for reporting illegal activity, and the jury awarded Roop compensatory damages. The circuit court entered a judgment notwithstanding the verdict in SPC's favor. The circuit court reasoned that the jury would have had to speculate whether the arrangement would have been illegal, as the employment, and thus the kickback, never took place. Roop appealed, arguing that the judge had erred in overturning the jury's verdict and in not thereafter proceeding with a hearing on punitive damages.

¶2.     We find that, under the standard of review for a judgment notwithstanding the verdict, all the testimony on Roop's behalf and all reasonable inferences in his favor support the jury's verdict that Roop was fired for reporting illegal activity. Thus, the circuit court's judgment overturning the jury's verdict is reversed, and this case is remanded to the circuit court to reinstate the jury's verdict and for further proceedings on Roop's other claims for punitive damages and attorney's fees.

## FACTS AND PROCEDURAL HISTORY

¶3.     Southern Pharmaceuticals Corporation ("SPC") is a medical supply company owned principally by Glenn Lingle and Doug Martin. Nearly seventy percent of SPC's business is funded by payments from Medicare and Medicaid. At the time, sales of diabetic equipment amounted to roughly three percent of SPC's operations. Henry Roop, who had several years of experience in medical sales, approached SPC about helping to increase its diabetic sales business. SPC hired Roop as its Diabetic Sales Director in June 2008.[1] Under Roop's

---

[1] Under the employment agreement, Roop was to work for three years, beginning in June 2008, for a salary of $75,000 per year, plus commission and other fringe benefits.

contract, SPC could terminate Roop if he failed "to maintain a minimum run rate for production of . . . [1,500] new diabetic patients per year based on each of the 15 branch managers maintaining a minimum . . . of 100 new diabetic patients per year."

¶4.     Roop traveled throughout Mississippi to help train SPC's branch managers in selling diabetic products. One of SPC's principal owners, Martin, sent all branches a "Plan of Action" for the following year. Martin specified that each branch manager would be required to work with Roop to achieve 100 new diabetic enrollments a year. Over the course of Roop's brief employment, he received two positive evaluations. But one evaluation contained some critiques, including failing to achieve the contract goal of 1,500 new diabetic patients after the first year.

¶5.     A month before Roop's termination, Martin called for Roop to focus his efforts on the poorly performing branches, which included the branch in Brandon, Mississippi. The branch manager in Brandon was Johnny Pettigrew. In July 2009, SPC sent Roop with Pettigrew to make a sales call on Central Medical Health Services Inc. ("Central Medical") in Brandon. Roop and Pettigrew met with Patrick Gregory (hereafter "Patrick"), the clinical coordinator of Central Medical, to solicit sales of SPC's diabetic equipment. Martin had set up the appointment with Patrick and had a preliminary conversation with Patrick about his wife working for SPC.

¶6.     During the meeting, Pettigrew gave Patrick one of SPC's employment applications for Patrick's wife, Josephine Gregory (hereafter "Josephine"), to complete. After leaving Central Medical, Roop and Pettigrew went to lunch and discussed the sales call. According

3

to Roop, Pettigrew told him that SPC was going to get in trouble, because Patrick's wife was not going to perform actual work or services for SPC. Roop called Martin and said that he was unaware of this side deal and that it was illegal to give someone a kickback to induce referrals. Martin called Roop back the next day and fired him. Roop received a termination letter from SPC shortly after.

¶7. Immediately after his termination, Roop engaged in email exchanges and phone conversations with Lingle over his termination. The sides could not reach an agreement about the termination, and Roop filed suit in September 2010. He alleged he was terminated for reporting conduct that violated the Medicare and Medicaid Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2) (2012). Roop's suit also included claims for breach of contract and for intentional infliction of mental distress. He sued Lingle and Martin individually for malicious interference with contract. SPC asserted in defense that Roop had been terminated for cause and denied any violation of federal law.

¶8. The case was tried before a jury in November 2013. Roop, owners Lingle and Martin, and Pettigrew all testified at trial. Patrick's and Josephine's deposition testimony was read in open court. After Roop rested, SPC moved for a directed verdict on all claims. The circuit court sustained the motion for a directed verdict in favor of Martin and Lingle, individually, dismissing them from the case. The circuit court also dismissed all claims against SPC except the claim of wrongful termination for reporting illegal activity and the breach-of-contract claim.

¶9.     Following the grant of the directed verdict on most of Roop's claims, SPC, in its case-in-chief, presented testimony from another branch manager to show that Roop had conflicts working with a branch manager. SPC rested but did not renew its motion for directed verdict. The circuit court submitted the jury-verdict form to the jury, as follows:

1.      Do you find from a preponderance of the evidence that [SPC] fired . . . Roop in violation of the terms of his employment contract?

2.      Do you find from a preponderance of the evidence that [SPC] fired . . . Roop for reporting illegal activity?

3.      What amount of actual damages do you award . . . Roop for lost wages?

¶10.    During jury deliberations, the jury sent a question to the judge about the language in Question One on the jury-verdict form, asking, "Is SPC in violation or is Henry in violation of the contract?" After on-the-record discussions, both sides had no objection to the trial judge instructing the jury to reread the instructions, stating that the answer to their question already was contained in the given instructions.

¶11.    After more deliberation, the jury returned its verdict. As to Question One for the breach-of-contract claim, the jury found in SPC's favor. (On the jury verdict form, the "No" box was checked, and the "Yes" box also was checked but marked out with the word "error" written beside it.) As to Question Two for the claim of termination for reporting illegal activity, the jury rendered a verdict in Roop's favor. In response to Question Three, the jury set the amount of damages as $18,750.[2]

---

[2] The circuit court polled the jury. Nine jurors agreed on the answer to question number one, ten jurors agreed on the answer to question number two, and eleven jurors agreed on the answer to question number three.

¶12.   After the return of the verdict, Roop's counsel requested that the trial proceed on the punitive-damages phase. The circuit court denied Roop's request because the judge found punitive damages were not appropriate and he was concerned about an inconsistent verdict. SPC then moved for a mistrial based on an inconsistent verdict[3] and for a judgment notwithstanding the verdict (JNOV).

¶13.   In response to SPC's motion for JNOV, the trial judge stated that he was unable to find any federal caselaw supporting Roop's contention that SPC was engaging in illegal activity. The trial judge also stated that "[c]learly, SPC would be in violation of the law if they 'hired' Josephine Gregory to 'work' for them and [she] in fact did no work but was paid a salary so that her husband might funnel referrals to SPC from Central Medical." The judge reasoned that to reach this result, "a jury would have to speculate that Josephine Gregory, even if she had been hired, would have been a sham . . . [rather than] a bona fide employee." Finding that the jury was not permitted to engage in speculation and that a belief standard as to illegality was not appropriate, the trial judge granted SPC's motion for JNOV.

¶14.   Roop appealed and raised the following issues: (1) whether the circuit court erred in granting JNOV on the issue of whether Roop was terminated for reporting illegal activity; and (2) whether the circuit court erred in denying a punitive-damages instruction without conducting an evidentiary hearing to determine whether punitive damages were appropriate.

**ANALYSIS**

_____

[3] The trial judge declined to declare a mistrial because the disputed instructions were agreed to by the parties. No issue regarding the mistrial was asserted on appeal.

**I. Whether the circuit court erred in granting JNOV on the issue of whether Roop was terminated for reporting illegal activity.**

### A. *Standard of Review*

¶15.     The standard of review for a trial court's grant of a JNOV is *de novo*, and this Court applies the same criteria as that of the trial court. ***Cheeks v. Autozone, Inc.***, 154 So. 3d 817, 822 (Miss. 2014). "[A] motion for a directed verdict challenges the legal sufficiency of the evidence; it asks if the plaintiff met the burden of going forward on the evidence." ***Wal-Mart Stores, Inc. v. Littleton***, 822 So. 2d 1056, 1058, (Miss. Ct. App. 2002). The Court must "view the evidence in the light most favorable to the nonmoving party." ***Cheeks***, 154 So. 3d at 822. "In essence, judgments as a matter of law present both the trial court and the appellate court with the same question—whether the evidence, as applied to the elements of a party's case, is either so indisputable, or so deficient, that the necessity of a trier of fact has been obviated." ***Cheeks***, 154 So. 3d at 822 (quoting ***White v. Stewman***, 932 So. 2d 27, 32 (Miss. 2006)).

¶16.     To decide if the circuit court erred in granting SPC's motion for JNOV on the issue of whether Roop was terminated for reporting illegal activity, we first must decide whether the alleged activity Roop reported was in fact illegal. If so, then we must determine if SPC fired Roop for reporting that illegal activity.

### B. *Whether the alleged activity Roop reported is in fact illegal.*

¶17.     In ***McArn v. Allied Bruce-Terminix Co., Inc.***, 626 So. 2d 603 (Miss. 1993), we established a narrow public-policy exception to Mississippi's employment-at-will doctrine. We held that "an employee who is discharged for reporting illegal acts of his employer . . .

7

is not barred by the employment at will doctrine from bringing action in tort for damages against his employer." *Id.* at 607. This also applies to written employment contracts. *Id.* "Applicability of the exception does not require that a crime has already been committed, but it does require that the acts complained of warrant the imposition of criminal penalties, as opposed to mere civil penalties." ***Hammons v. Fleetwood Homes of Miss. Inc.***, 907 So. 2d 357, 360 (Miss. Ct. App. 2004) (citation omitted).

¶18.    Roop alleges that the illegal act he reported here is SPC's violation of the Medicare/Medicaid Anti-Kickback Statute, which states in relevant part:

> (2) whoever knowingly and willfully *offers* or pays any remuneration (including any *kickback*, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person–
>
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> . . .
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b)(2) (2012) (emphasis added).

¶19.    The instruction that the circuit court granted required Roop to prove that the activity he reported was *in fact* illegal. Instruction D-5 stated:

> The burden is on Henry Roop to prove at trial that the activity he reported was in fact, illegal.
> . . .
> In order to prove a violation of the Federal Anti-Kickback Statute, Henry Roop must prove:
>
> 1)    The Defendant knowingly and willfully,
> 2)    offered or paid remuneration in cash or in kind,

3)      to induce a person to purchase, lease, order, or arrange for or recommend purchasing, leasing, or orderings, and,

4)      any good, facility, service or item for which payment may be made in whole or in party under Medicare.

¶20. Although the jury returned a verdict in Roop's favor under this instruction, the trial judge concluded that he was unable to find any federal caselaw supporting Roop's contention that SPC was engaging in illegal activity by making an "offer" alone. SPC also posits that Roop provides no legal analysis of what constitutes a violation of the statute. But Roop argues that such legal analysis is unnecessary, since the applicable statute plainly states that: "Whoever knowingly and willfully *offers* or pays . . . kickback . . . shall be guilty of a felony . . . ." 42 U.S.C.A. § 1320a-7b(b)(2) (emphasis added). So there is no need for any legal analysis or statutory construction when the language of the statute is clear. *See Lawson v. Honeywell Int'l., Inc.*, 75 So. 3d 1024, 1027 (Miss. 2011). "If the words of a statute are clear and unambiguous, the Court applies the plain meaning of the statute and refrains from using principles of statutory construction." *Id.*

¶21. Under the plain meaning of the statute, the alleged activity Roop reported–SPC's offer to Patrick to "hire" Josephine to "work" for them, but that she in fact would perform no work but receive a commission on Patrick's referrals to SPC from Central Medical–was illegal. In fact, both the trial judge and Martin agreed that such a scheme would be illegal. But the trial judge stated that SPC would have violated the law if it had *hired* Josephine to "work" for SPC, "and in fact did no work but was paid a salary so that her husband might funnel referrals to SPC from Central Medical." Roop argues that this analysis by the trial judge

9

overlooks the part of the anti-kickback statute which makes even an *offer* of a kickback illegal. We agree.

### 1. An offer is sufficient to prove a violation of the anti-kickback statute.

¶22.    SPC did not actually have to "hire" Josephine to engage in illegal activity. One federal district court also has noted this. In a case involving a completed kickback scheme, the judge stated, "the AKS [anti-kickback statute] does not require a kickback scheme to succeed in generating new business (i.e., new patient prescriptions) in order for a violation to have occurred . . . . A pharmaceutical company violates the AKS if it 'offers' a pharmacy a kickback 'to induce' the pharmacy to 'recommend[ ] purchasing' the company's drugs ." *U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 23 F. Supp. 3d 242, 263 (S.D. NY 2014) (internal citations omitted). *See also* **United States v. Duz–Mor Diagnostic Lab., Inc.**, 650 F.2d 223, 227 n.5 (9th Cir.1981) (noting in a criminal case involving bribery that, under the predecessor statute to Section 1320a–7b, offering a bribe in exchange for a referral of patients for services reimbursable under Medicare was still a violation of the statute, even though the person to whom the bribe was offered was a government informant who could never have made the requested referral.). Admittedly, the conversation constituting an offer in *Duz-Mor* was tape-recorded by the police. *Id.* at 225. We do not have the benefit of a recording here.

¶23.    So SPC did not have to hire Josephine as a sham employee to induce Patrick to send referrals from Central Medical; it only had to offer such. The issue then is whether SPC offered such an illegal arrangement. On this issue, both parties presented conflicting

10

testimony. "When there is conflicting testimony, the jury determines the weight and worth of the witnesses' testimony and credibility at trial." **White v. Stewman**, 932 So. 2d 27, 36 (Miss. 2006) (citing **Wallace v. Thornton**, 672 So. 2d 724, 727 (Miss. 1996)). Roop argues that he presented substantial testimony to support the jury's finding that the activity he reported was illegal. The following relevant evidence was presented at trial.

¶24.    Pettigrew previously had told Martin that Patrick was the man to see to get Central Medical to try SPC's products. Although Patrick stated that he did not have legal authority to direct referrals to vendors like SPC and that he could influence the medical provider to use a specific vendor in only two-to-five percent of cases, Patrick did concede that it was "possible" that his position with Central Medical "could have brought in a lot of business for SPC."[4] Either way, Patrick was the person whom SPC pursued to get Central Medical's business.

¶25.    Since Martin knew Patrick, he called to make an appointment for Pettigrew and Roop to make a sales call on Patrick. Martin testified that Patrick–*in the same phone conversation about Central Medical buying from SPC*–asked him about job availabilities at SPC for Josephine.[5] Patrick initially claimed this conversation included discussions about *his* becoming a salesman for SPC, and that there were no discussions about employing his wife. But after being shown his wife's application, he agreed that it was his wife who was going to be employed by SPC.

---

[4] Patrick's deposition testimony was read in open court.

[5] Patrick also testified that he previously had spoken to owners Lingle and Martin, and branch manager Pettigrew about doing business.

11

¶26. Josephine denied that she had talked with anyone about a job at SPC. Josephine also admitted that the writing on the job application was her husband's, but that it contained her signature. Josephine did not remember Patrick filling the application out for her, and she vaguely remembered Patrick mentioning the possibility of working for SPC. Pettigrew also testified that he had talked with Martin about hiring Josephine as an employee of SPC. At trial, Patrick denied knowing how Josephine would be paid, but this was contrary to his deposition where he stated that Josephine was to be paid a ten-percent commission.

¶27. Apparently Roop was aware of the possibility of hiring Josephine. Roop testified that, after the meeting with Patrick at Central Medical, Roop emailed Martin. Roop told Martin that Patrick liked their diabetic equipment and that there was no doubt that SPC would get Central Medical's business since Josephine had filled out the paperwork to be an employee. At the time Roop sent this email, Roop claimed he did not know anything about a "deal" between Patrick and SPC, and that Josephine was not actually going to perform work as an employee of SPC.

¶28. Roop testified that, during lunch after the sales call, Pettigrew told him that SPC was "going to get in trouble because they can't give Pat Gregory's wife Josephine Gregory an employment agreement if she is not even going to work for SPC." Pettigrew denied this conversation took place. Josephine worked for a day-care center at the time,[6] and Roop

---

[6] Josephine testified that, even though she was working for a day-care center at the time, she previously had worked for SPC several years ago on a part-time basis. She believed she had extensive contacts with people who needed diabetic supplies.

believed that an arrangement had been made that, for all the Central Medical business Patrick referred to SPC, a check would be sent to his wife for ten percent of that business.

¶29. Roop testified he immediately called Martin and said that he had "no idea that this kind of deal was taking place." Roop reasoned that SPC couldn't give "a kickback like that . . . . Because if you would do it straight up, why didn't you just hire Mr. Gregory? . . . Why did you have to fill out an employment agreement for the wife to get the ten percent to refer all of the business to SPC . . . . That's not right . . . that's illegal." According to Roop, Martin called him back the next day and told him, "it ain't working out . . . [w]e're terminating you," and hung up.

¶30. Martin denied there was any agreement to pay Josephine ten percent of what Central Medical purchased from SPC. Martin stated that such an offer would be illegal, because he understood that it "would absolutely be a kickback." Martin testified that after firing Roop, he talked to a healthcare lawyer. Martin testified that the lawyer advised him it was perfectly legal for SPC to hire Patrick's wife, because it would qualify as an exception to the anti-kickback statute. But the lawyer recommended that SPC not hire her.

¶31. SPC argues that the above evidence is legally insufficient to support Roop's *McArn* claim. *See McArn*, 626 So. 2d at 607. SPC also argues Roop offers only his own testimony and speculation in support of his conclusion that SPC engaged in actual illegal activity. SPC notes that courts have rejected similar claims based on a plaintiff's conclusory assertions as legally insufficient. SPC cites an unpublished opinion, *Vaughan v. Carlock Nissan of Tupelo, Inc.*, 553 F. App'x 438 (5th Cir. 2014). There, the Fifth Circuit affirmed the district

13

court's grant of summary judgment on the claim because "her mere conclusory assertions that the activities were actually illegal" did not satisfy the *McArn* standard. *Id.* at 441.

¶32.    Even if *Vaughn* was binding precedent, there are distinctions between *Vaughn* and this case. Roop was personally present when the employment application was delivered to Patrick. The application was filled out by Patrick, not his wife, who admitted knowing very little about the proposed hiring. The employment application was presented at the same time that a sales call was being made to secure new business from Central Medical. Roop also argues he also had the benefit of the admission of SPC's branch manager Pettigrew, who told him that SPC was going to get in trouble because Josephine was not even going to work for them. Based on this revelation, Roop claims he made a good-faith effort to report the illegal activity to Martin.

### 2.    *Bona-fide-Employee Exception to the Anti-kickback Statute*

¶33.    SPC also argues that  Roop fails to take the bona-fide-employee exception into consideration. In overturing the jury's verdict, the trial judge reasoned that, to reach that verdict, "a jury would have to speculate that Josephine Gregory, even if she had been hired, would have been a sham . . . [rather than] a bona fide employee." Under the safe-harbor provision, the statute's criminal prohibition does not apply to "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items of services." 42 U.S.C. § 1320-7b(b)(3)(B) (2012).

14

¶34.    SPC relies on an analogous bona-fide-employee case. In ***United States ex rel Baklid-Kunz v. Halifax Hosp. Med. Ctr.***, 2013 WL 6196562, *5 (M.D. Fla. Nov. 26, 2013), a district court analyzed if compensation that included a bonus to medical providers employed at the hospital, a part of which was for referring patients to the hospital's oncology centers, violated the Anti-Kickback Statute. ***Id.*** at **1-2. The court noted in its analysis that "[t]his is not the typical Anti-Kickback Statute case, where one or more of the accused participants in the criminal scheme testifies that the payments he or she received from the defendant were intended to induce referrals . . . . In this case, there has been no such testimony." ***Id.*** at *7 (citation omitted). The relator argued that the bonus component that comprised the referrals was a kickback that could not be protected by the bona-fide-employee exception. ***Id.*** at *8. The court did not agree, finding, "[s]imply stated, the Bona Fide Employee Exception provides that the normal prohibition on payments to induce referrals does not apply where the payments are made to a (for the lack of a better word) legitimate employee." ***Id.***

¶35.    SPC states that here, as in ***Halifax***, Roop does not cite any testimony from either Patrick or Josephine that either of them would have received any money from SPC for Patrick's referral of patients to buy SPC's equipment, or that Josephine would have been anything other than a legitimate employee. SPC points out that it extended only an employment application, Josephine was never interviewed, the details of her employment were never discussed, and that she was never hired by SPC. Roop, SPC contends, offered only his own testimony that he learned from Pettigrew about the illegality of the terms. Even if Josephine were to receive a commission on equipment sold at the clinic in which Patrick

15

worked, SPC claims this commission would not violate the Anti-Kickback statute because it is the very type of payment that is contemplated by the bona-fide-employee exception. The only case in which the payment of commissions to Josephine would violate the Anti-Kickback statute would be if she was going to receive payment but was not going to be an actual employee of SPC.

¶36.    Roop maintains that direct evidence, such as SPC's confessing an intent to engage in a sham transaction, was not required, since "'[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'" ***Desert Palace, Inv. v. Costa***, 539 U.S. 90, 100, 123 S. Ct. 2148 (2003) (citation omitted). Roop argues that such circumstantial evidence includes that Josephine did not even know she was being considered for hire or that she was going to be paid ten percent of whatever purchases were made by her husband's company. Roop correctly notes that no employer will admit to engaging in illegal activity.

¶37.    Roop also argues that the fact that an employer abandons its plan to commit an illegal act is no reason to allow that employer to retaliate against the employee because the complaint resulted in the illegal activity never coming to fruition. An employer should not escape liability for not completing its illegal act, simply because an employee prevented it from doing so. Roop argues that, the fact that an employee frustrates a criminal kickback scheme does not make the scheme any less criminal. We agree. Taking SPC's and the trial judge's reasoning to the logical extreme would mean that Roop would have had to wait for SPC to hire Josephine to see if she would have been a bona-fide or sham employee. This

16

contradicts the portion of the statue which makes even an *offer* of a kickback illegal, and it does not further the public policy of this Court clearly established in *McArn*.

¶38. We find that Roop provided sufficient evidence for the jury to determine whether SPC engaged in that illegal act by "offering" a kickback. Having found so, we must determine whether SPC fired Roop for reporting that illegal activity.

### C. Whether SPC fired Roop for reporting illegal activity.

¶39. "A trial court's grant of a JNOV is reviewed to determine whether the judge properly found that the jury's verdict was not supported by a legally sufficient evidentiary basis." *White v. Stewman*, 932 So. 2d 27, 36 (Miss. 2006). "To facilitate a sufficiency of the evidence review, this Court considers all evidence in the light most favorable to the nonmoving party, giving that party the benefit of all favorable inferences that may be reasonably drawn from the evidence." *Id.* (citing *Steele v. Inn of Vicksburg, Inc.*, 697 So. 2d 373, 376 (Miss. 1997)). "If the facts and inferences drawn from this evidence point so overwhelmingly in favor of the movant that reasonable jurors could not have arrived at a contrary verdict, the motion should be granted." *Id.* (citing *Ferguson v. Snell*, 905 So. 2d 516, 520-21 (Miss. 2004)).

¶40. "On the other hand, if there is evidence of such quality and weight that reasonable and fair minded jurors in the exercise of their impartial judgment might reach different conclusions, the jury verdict should be allowed to stand, and the motion should be denied." *Id.* (citing *Upchurch v. Rotenberry*, 761 So. 2d 199, 204 (Miss. 2000)). "When there is conflicting testimony, the jury determines the weight and worth of the witnesses' testimony

17

and credibility at trial." *Id.* (citing ***Wallace v. Thornton***, 672 So. 2d 724, 727 (Miss. 1996)). "A reversal of a jury verdict is not warranted unless it is against the overwhelming weight of the evidence and credibility of the testimony." *Id.*

¶41. We believe that a reasonable jury could have reached different conclusions here. Sufficient evidence was introduced at trial to conclude reasonably that SPC fired Roop for reporting illegal activity. It was also the jury's role to weigh conflicting testimony offered by Roop and SPC.

¶42. Such conflicting testimony included that SPC fired Roop for legitimate reasons. Roop argues that, of course, SPC would argue it fired him solely for legitimate reasons. For example, the defendant in *McArn* never admitted that it fired McArn because he refused to illegally dilute chemicals that were being used to treat customers' homes for termites. *McArn*, 626 So. 2d at 605. Instead, the defendant claimed that McArn called his supervisor a "no good [S.O.B.]," that McArn complained he was overworked, and that the defendant "was not aware of any claim by McArn that he was being required to apply insufficient chemicals to termite treatments." *Id.* at 605-06. The defendant produced this evidence through several witnesses. Nevertheless, this Court reversed the directed verdict against the defendants and remanded to determine whether McArn was discharged for a refusal to commit an illegal action for reporting the same. *Id.* at 607.

¶43. Lingle testified here that SPC fired Roop after only a year because the company was spending too much time and energy on a plan that did not work. Lingle cited Roop's failure to gain 1,500 new diabetic patients, which his contract required, and conflicts with the branch

18

managers with whom he worked, as other reasons for termination. Roop contradicted this with his testimony that, when Martin fired him, only the "kickback thing" was mentioned. It was not until later conversations that both Martin and Lingle claimed that Roop's failure to meet his contract sales goals played a role in his termination. Additionally, several pages of correspondence between Lingle and Roop before Roop's termination were introduced at trial; Lingle admitted there was never anything in writing to suggest the company was planning to terminate Roop before the trip to Central Medical.

¶44.    Lingle also described Roop's paperwork as "hit and miss." But Roop had sent Martin and Lingle a very detailed report in June 2009 summarizing the work of each branch manager. The record shows Roop received a ninety-day performance evaluation in September 2008, which contained only positive remarks. An evaluation from June 2009 also gave Roop great reviews. But it did state that "[o]verall we did not reach our contract goal," and stated that SPC needed to adjust its structure "to use [Roop]'s skills to the fullest and [Roop] must modify some of his communication skills to get maximum work out of the Sales Representatives and Managers." Roop argues that SPC had not given him a single sales record, so he could not determine the amount of sales the company made.

¶45.    Roop claimed that his agreement required branch managers to be terminated if he was terminated. Lingle admitted that no branch managers were terminated, even though the contract stated that "[i]f a branch manager does not meet the annual run rate for production, then that branch manager is also liable for termination." SPC countered that, since the sales

of diabetic equipment amounted to roughly three percent of its operations, it was unreasonable and unwarranted to fire the branch managers.

¶46.    According to Martin, it was a total coincidence that the company fired Roop the day after he delivered the employment application to Josephine. Roop argues another way to prove an illegal act caused a termination is to show close timing between the protected activity and termination. An example of this is found in ***Nero v. Industrial Molding Corp.***, 167 F. 3d 921 (5th Cir. 1999). In ***Nero***, the plaintiff suffered a heart attack, and after subsequent medical bills, the employer fired him. ***Id.*** at 924. The defendant claimed that it actually made the termination decision before the heart attack. ***Id.*** at 926. The Fifth Circuit held that close timing in itself could permit a jury to find against the employer. ***Id.*** at 927-28. Likewise, Roop argues, a jury could find that he was "performing his job properly," and the time of his termination (the day after he reported the illegal activity) was not merely a coincidence.

¶47.    We find that a "reasonable, hypothetical juror" could have returned a verdict as the jury did here. ***Henson v. Roberts***, 679 So. 2d 1041, 1045 (Miss. 1996). Substantial evidence was introduced at trial for the jury to conclude reasonably that SPC fired Roop for reporting illegal activity. The evidence supports the jury's verdict in favor of Roop. Thus, the circuit court erred by setting aside the jury verdict, and we reverse the grant of SPC's motion for a JNOV and reinstate the jury's verdict.

    **II.**    **Whether the circuit court erred in denying a punitive-damages instruction without conducting an evidentiary hearing to determine whether punitive damages were appropriate.**

¶48. Because the jury here found that SPC had engaged in illegal conduct and awarded Roop compensatory damages, Roop argues that the circuit court erred in refusing to conduct a hearing on the issue of punitive damages. As the trial judge had granted a JNOV at the conclusion of Roop's case on compensatory damages, the issue of punitive damages was never ruled on. Since we find that the trial judge erred in overturning the jury's verdict as to the claim for wrongful termination for reporting illegal activity, this case should be remanded to the circuit court for the trial judge to empanel a jury and hold "an evidentiary hearing to determine whether punitive damages may be considered . . . ." Miss. Code Ann. § 11-1-65 (c) (Rev. 2014).

**CONCLUSION**

¶49. For the foregoing reasons, the final judgment in favor of Southern Pharmaceuticals Corporation is reversed, and we reinstate the jury verdict of actual damages in the amount of $18,750. We also remand this case to the circuit court, to (1) empanel a new jury and hold an evidentiary hearing to determine whether punitive damages may be considered, and (2) for consideration of Roop's entitlement to attorneys' fees under the parties' employment contract.[7]

¶50. **REVERSED AND REMANDED.**

**DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, KING, COLEMAN, MAXWELL AND BEAM, JJ., CONCUR.**

---

[7] SPC's motion for attorneys' fees is pending in the circuit court, as it is based on the provision in the parties' contract which states that the prevailing party is entitled to an award of reasonable attorneys' fees and costs, including appellate proceedings.