# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2014-CA-01371-SCT

*ELSIE SMITH, INDIVIDUALLY AND AS*
*REPRESENTATIVE OF THE ESTATE OF LARRY*
*D. SMITH, DECEASED: AMY SMITH RHODES,*
*OUIDA SMITH DAWKINS, LARRY CLINT SMITH*
*AND BONNIE SMITH WITTY*

*v.*

*UNION CARBIDE CORPORATION f/k/a UNION*
*CARBIDE PLASTICS & CHEMICALS COMPANY,*
*INC., CHEVRON PHILLIPS CHEMICAL*
*COMPANY LP, SUCCESSOR-IN-INTEREST TO*
*CONOCO PHILLIPS COMPANY f/ka PHILLIPS*
*PETROLEUM COMPANY, AND PHILLIPS 66*
*COMPANY FORMERLY d/b/a DRILLING*
*SPECIALTIES COMPANY a/k/a CHEVRON*
*PHILLIPS CHEMICAL COMPANY, LP AND*
*MONTELLO, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/22/2014 |
| TRIAL JUDGE: | HON. RICHARD W. McKENZIE |
| TRIAL COURT ATTORNEYS: | GREGORY N. JONES |
| | S. ROBERT HAMMOND, JR. |
| | LAURA D. GOODSON |
| | ELIZABETH TURLEY |
| | MARCY CROFT |
| | J. JEFFREY TROTTER |
| | LINDSEY O. WATSON |
| | ANDREW HARTMAN |
| | DAVID GIBBONS |
| COURT FROM WHICH APPEALED: | SMITH COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | GREGORY N. JONES |
| | S. ROBERT HAMMOND, JR. |
| | EUGENE C. TULLOS |
| | E. HYDE CARBY |

ATTORNEYS FOR APPELLEES:         LAURA D. GOODSON
                                 MARCY B. CROFT
                                 JULIE E. CHAFFIN
                                 ELIZABETH TURLEY
                                 J. JEFFREY TROTTER
                                 LINDSEY O. WATSON
                                 ALEX E. COSCULLUELA
                                 A. CHRISTOPHER DERDEN
                                 HOLMES S. ADAMS
NATURE OF THE CASE:              CIVIL - PERSONAL INJURY
DISPOSITION:                     REVERSED AND REMANDED - 09/22/2016
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE WALLER, C.J., LAMAR AND KITCHENS, JJ.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1.     This is Elsie Smith's second appeal to this Court.  A jury awarded her more than three million dollars in damages after an asbestos trial in 2009, but the trial judge granted the defendants' motion for judgment notwithstanding the verdict ("JNOV").  Elsie appealed, and this Court reversed and remanded for further proceedings.  Following remand, the trial judge again entered a JNOV, and Elsie now appeals that ruling.  We reverse and remand.

### FACTS AND PROCEDURAL HISTORY

¶2.     Larry Smith worked on various drilling rigs from the mid-1960s until the early 1990s. *Smith v. Union Carbide Corp.*, 130 So. 3d 66, 67 (Miss. 2013) ("*Smith I*").  He also was a heavy smoker, smoking roughly two to three packs per day for almost thirty years. *Id.*  He was diagnosed with lung cancer in August 2002 and died three months later. *Id.*

¶3.    His widow Elsie and his other heirs filed a wrongful death action against several defendants in 2006.[1]  *Id.*  The plaintiffs brought a strict liability claim under a products liability design-defect theory and claimed that Larry's exposure to the defendants' asbestos-containing products[2] on the oil rigs caused his lung cancer.  *Id.*  After a three-week trial in May 2009, the jury returned a verdict for Elsie and assessed total damages of $3,856,346.17.  *Id.* at 68.  The jury allocated 35% of the fault to Chevron, 10% to Montello, 35% to UCC, and 20% to Larry's smoking.  *Id.*

¶4.    All of the defendants filed post-trial motions for JNOV and for a new trial, raising many different arguments.  The trial judge ultimately denied the defendants' motions for a new trial.  But he granted JNOV on the sole issue of causation, and more specifically, on the plaintiffs' insufficient proof regarding Larry's exposure to the defendants' asbestos products:

> The evidence presented at trial with respect to the plaintiffs' decedent Larry Smith's occupational exposure to asbestos consisted of the testimony of co-workers Howard Case, Denver Anding, Billy Jack Graves and Joe Fitzhugh. Taken as a whole, this testimony was insufficient to establish that plaintiffs' decedent was exposed to any asbestos product of any defendant on a frequent and regular basis in proximity to where Smith actually worked.  Thus, [plaintiffs] failed to meet their burden of proof with respect to causation . . . . For [these reasons], the jury's verdict cannot stand and must [be] set aside and the motion for new trial denied.

---

[1]By the time of trial, only three defendants remained: Union Carbide Corporation ("UCC"), Montello, Inc., and Chevron Phillips Chemical Co. ("Chevron").  *Id.*

[2]UCC supplied asbestos for Visbestos and Super Visbestos products, and Montello distributed those products.  Montello also distributed Shurlift.  Chevron's asbestos products were Flosal and Visquick.  And both Chevron and UCC supplied asbestos for IMCO Best, Superbest, and Shurlift.  *Id.*

¶5. Elsie appealed,[3] and this Court reversed and remanded. *Id.* at 71. This Court noted that only one Mississippi case had applied the "frequency, regularity, and proximity" test outside of the context of a motion for summary judgment or a directed verdict. *Id.* at 69-70. After further discussion, this Court said

> We clarify today that the "frequency, regularity, and proximity" test is a *de minimus* rule employed to determine whether a plaintiff has successfully made a *prima facie* case solely in the context of summary judgment or directed verdict. . . . At the jury consideration stage, the "frequency, regularity, and proximity" test falls away, and a plaintiff must demonstrate the elements of a design defect product liability claim as delineated in Mississippi Code Section 11-1-63, including proximate causation. . . . In the context of the motion for JNOV now before us, the trial court erred as a matter of law when it applied the "frequency, regularity, and proximity" test outside a summary judgment or directed verdict situation. Instead, the trial court should have matched the plaintiffs' proof against the statutory elements of a design defect product liability claim, just as would be required in any nonasbestos negligent design litigation.

*Id.* at 70-71. This Court therefore reversed the trial judge's grant of JNOV and remanded the case "for further proceedings consistent with the instant opinion, including reconsideration of the grant of JNOV in accordance with the statutorily established elements of the plaintiffs' negligent design claim." *Id.*

¶6. Following remand, the trial judge[4] appointed a special master to consider the case. The trial judge then asked the parties to brief "all issues that [they] believe are still pending before the Court in light of the Supreme Court's mandate of February 6, 2014." Following

---

[3]The defendants did not cross-appeal their other JNOV arguments or the trial judge's denial of their motions for a new trial.

[4]The judge who had presided over the trial had since died, so another trial judge had taken over the case.

briefing and argument, the special master concluded that the JNOV should be reaffirmed, again analyzing the exposure issue only:

> Of course, an essential element of proximate cause is exposure – that is, under the facts of this case, the plaintiffs must demonstrate by a preponderance of the evidence that Larry Smith was actually exposed to the particular defendant's product to a degree sufficient for that particular product to be a proximate cause of Smith's lung cancer. This evidence came to the trial solely through 4 co-workers – Howard Case, Denver Anding, Billy Jack Graves, and Joe Fitzhugh. . . . I have reviewed all of this evidence in detail from the transcripts. In my view, the testimony is not a model of consistency. But, there is eyewitness testimony from more than one of these witnesses contending that Smith was either present or participating when one or more of the defendants' products were being utilized – although the proof with regard to the quantitative and/or qualitative levels of exposure is imprecise. Considering the evidence as a whole under the proper standards for JNOV, I would say it is, at best, a close question, and then only if one gives the non-movant the benefit of all reasonable inferences. However, I cannot ignore the fact that my reading is based on a cold record. Judge Evans was there throughout; he heard all of the evidence, and "smelled the smoke" of battle, as it were. Clearly, Judge Evans was in a far superior position to adjudge the sufficiency of the evidence. Giving even minimal deference to those findings, as I believe I must, and considering that Judge Evans found specifically that the proof did not meet even the *de minimus* standards of "frequency, regularity and proximity," I recommend that the Court affirm Judge Evans' order of January 26, 2010 granting judgment notwithstanding the verdict in favor of defendants.

¶7. The trial judge allowed the parties to file objections to the special master's report and recommendation and then held a hearing. The trial judge summed up the procedural posture of the case as follows:

> The arguments presented by the parties at the hearing fairly well tracked those presented in their written submissions. Their respective positions boil down to this: Plaintiffs want this Court to set aside Judge Evans' grant of [JNOV], and reinstate the jury's verdict. Defendants, on the other hand, want the Court to affirm the decision of the original trial court, as well as [address] other issues which are arguably not required to be decided as a part of the Court's decision on this specific issue.

5

The trial judge ultimately adopted the special master's recommendation and reaffirmed JNOV in favor of the defendants. After quoting a portion of the special master's report and recommendation, the trial judge said:

> In this case, the exposure proof hinged on the testimony of certain co-workers of the decedent. The credibility of this testimony, viewed in the context of the trial and all of the other evidence both pro and con, would be critical to consideration of any post-trial motions – especially one setting aside a jury verdict. In the Court's opinion, Judge Evans was in a far superior position to assess that proof in accordance with the statutory standards and reach a proper decision, and nothing that has been presented has dissuaded this Court from that opinion. Therefore, having again considered [the special master's recommendation]; and, having given due consideration to the submissions and arguments of the parties, as well as the applicable law, the Court finds no error in [the special master's recommendation] and hereby adopts same. . . . Judge Evans' order granting JNOV is hereby reaffirmed by the Court.

¶8.     Elsie now appeals and argues (1) that the trial court erred in adopting the Special Master's recommendation and reaffirming JNOV "when the record reflected sufficient evidence supporting the jury verdict on the issue of causation under Miss. Code Ann. § 11-1-63"[5]; and (2) that the trial court erred when it granted deference to Judge Evans—the judge who had presided at trial—"instead of the jury which issued a verdict."

**ANALYSIS**

**I. The trial court erred when it granted deference to Judge Evans.**

¶9.     Elsie argues that the special master and the current trial judge erred when they deferred to Judge Evans's prior ruling. She argues that they were "required to determine

---

[5]The parties also briefed arguments regarding the medical testimony, as part of the causation issue, as well as arguments regarding other portions of the products liability statute. But because the trial judges' opinions focused solely on the exposure testimony, we limit our sufficiency analysis to that issue.

6

whether, *in a light most favorable to [the] plaintiffs*, there was sufficient evidence to support the jury's verdict." (Emphasis in original.) She argues further that they were "not sitting in an inferior position—[they] were charged with a *de novo* application of the correct law to the facts in the record."

¶10. We agree. In *Smith I*, this Court remanded the case "for further proceedings consistent with the instant opinion, including reconsideration of the grant of JNOV in accordance with the statutorily established elements of the plaintiffs' negligent design claim." *Smith I*, 130 So. 3d at 71. And a motion for JNOV tests the *legal sufficiency* of the evidence supporting the verdict. *Id.* at 68 (emphasis added). As such, on remand, the trial judge was to determine from the record whether the plaintiffs had presented legally sufficient evidence to support the verdict. That determination is solely a legal one, and the special master and the trial judge erred when they gave deference to Judge Evans's initial JNOV ruling.

¶11. But the special master's and the trial judge's improper deference to Judge Evans does not automatically require reversal, because this Court reviews a trial judge's grant of JNOV *de novo*. *Id.* So we turn now to Elsie's second issue on appeal and the evidence that she presented at trial.

### II. The exposure evidence was sufficient to support the verdict.

¶12. "A motion for JNOV tests the legal sufficiency of the evidence supporting the verdict, not the weight of the evidence." *Id.* at 68. "'Where a motion for [JNOV] has been made, the trial court must consider all of the evidence—not just evidence which supports the

7

non-movant's case—in the light most favorable to the party opposed to the motion.'" ***Id.*** (citation omitted). "'The non-movant must also be given the benefit of all favorable inferences that may reasonably be drawn from the evidence.'" ***Id.*** (citation omitted). "'If the facts and inferences so considered point so overwhelmingly in favor of the movant that reasonable [jurors] could not have arrived at a contrary verdict, granting the motion is required.'" ***Id.*** (citation omitted). "'On the other hand, *if there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fairminded [jurors] in the exercise of impartial judgment might reach different conclusions, the motion should be denied and the jury's verdict allowed to stand*.'" ***Id.*** (citation omitted) (emphasis added).

¶13. "In any tort case, identifying and proving the source of the harm that proximately caused a plaintiff's injuries is essential." ***Miss. Valley Silica Co. v. Reeves***, 141 So. 3d 377, 382 (Miss. 2014). "'Recoverable damages mu[st] be reasonably certain in respect to the efficient cause from which they proceed, and the burden is on claimant to show by a preponderance of the evidence *that the person charged was the wrongful author of that cause*.'" ***Id.*** (citation omitted) (emphasis in original). "'The defendant's wrongful conduct must be a cause in fact of plaintiff's injury before there is any liability.'" ***Id.***

¶14. Regarding causation, the Mississippi Products Liability Act requires a plaintiff to prove by a preponderance of the evidence that "[t]he defective and unreasonably dangerous condition of the product *proximately caused* the damages for which recovery is sought." Miss. Code Ann. § 11-1-63(a)(iii) (Rev. 2014) (emphasis added). "'Causation may be

proven by direct evidence but this type of proof is not essential. . . . [T]he burden of proof to establish causation may be met by showing *sufficient facts to allow a jury to infer defective quality and that such defective quality was a substantial element in producing the injury complained of*.'" ***Mine Safety Appliance Co. v. Holmes***, 171 So. 3d 442, 449 (Miss. 2015) (citation omitted) (emphasis added). "Product exposure is a threshold question in products liability cases: "'[I]t is incumbent upon the plaintiff in any products liability action to show that the defendant's product was the cause of the plaintiff's injuries.'" ***Dependable Abrasives, Inc. v. Pierce***, 156 So. 3d 891, 896 (Miss. 2015) (citation omitted).

¶15.    "Generally, causation in a products-liability action may be proven through circumstantial evidence." ***Holmes***, 171 So. 3d at 450 (citation omitted). "But, in actions in which a claimant argues he suffered an injury related to exposure to a harmful product, he may not rely on circumstantial evidence which amounts to a *post hoc ergo propter hoc* finding of a harmful dose." ***Id.***   "Causation in a products-liability action may not be proven simply by arguing that because Y occurred and subsequently X occurred, that Y caused X." ***Id.*** at 450-51.  "Something beyond a sequential happenstance is required." ***Id.*** at 451.

¶16.    As discussed above, both trial judges granted JNOV solely on the issue of causation, and specifically, on the plaintiffs' insufficient proof regarding Larry's exposure to the defendants' asbestos products.  We likewise limit our analysis of the evidence presented to that issue.

Elsie Smith

¶17.    Elsie testified that Larry worked in the oil field "practically all of his life." He worked on drilling rigs as a roughneck and a floorhand, and Elsie thought he also worked derricks some and was a toolpusher "on up to drilling superintendent." Elsie testified that she and Larry married in 1967, and that he was "in good health," except for one setback in August 1994, when he had a heart attack. Larry began complaining of shoulder pain in August 2002 and was quickly diagnosed with lung cancer. Larry underwent chemotherapy once a week and radiation five days a week, and his condition went "[p]rogressively downhill."

¶18.    After six weeks of treatment, Larry "rested" for a couple of weeks and then decided that he did not want any more treatment. His doctor called in hospice, and Larry was treated at home until he was readmitted to the hospital, where he passed away on November 30, 2002. Elsie's counsel entered the amount of Larry's medical and funeral expenses into evidence: $95,596.17 and $10,932, respectively. These amounts had been agreed to by the defendants.

¶19.    On cross, Elsie testified that she did not know when Larry had started smoking, but that he was already smoking when they were married in 1967, and he continued smoking until the mid-1970s. Upon further questioning, Elsie said that Larry was smoking in the mid-1950s; he stopped for a few months, but then resumed. Defense counsel introduced some of Larry's medical records from 1986 into evidence, in which his physician noted "[c]ardiopulmonary disease, secondary to at least a sixty [pack-year] history of smoking." Elsie did not agree with that estimate. The records also said that the physician had prescribed

10

Nicorette gum for Larry, which indicated that he was still smoking into the eighties, contrary to Elsie's recollection that he quit in the mid-seventies. But Elsie still believed that Larry had quit prior to that time. Defense counsel also introduced some medical records from February 1995 in which Larry indicated that he had smoked three packs a day for twenty years.

Howard Case

¶20. Howard Case testified that he met and became friends with Larry in the mid-sixties when they were working on the same rig. He and Larry worked together "off and on" from 1966 until they quit working in 1990. Larry mixed drilling mud, and Case would relieve him. Case and Larry were working for Barnwell when they first met, and they used fifty-pound bags of Flosal to thicken the drilling mud. This was a dusty process; they breathed in the dust, and they did not use respirators. Case did not know how much Flosal they used, but he said they would use more than twenty bags when mixing the mud. Case testified that they would mix drilling mud in preparation for a "spud in," as well as when they would clear the hole of cuttings and when they would seal it off.

¶21. Case worked for Reading & Bates in 1967, and both he and Larry used Flosal there as well. Case and Larry worked for Big Chief in 1972, and they again mixed asbestos drilling mud additives—specifically, Super Visbestos, Visbestos and Flosal. Case and Larry worked for Helmerich & Payne in 1973 and 1974, and they used Flosal, Super Visbestos, Visbestos. They also mixed with Shurlift, but Case could not recall at which company. Case and Larry worked for Delta Drilling from 1974 to 1988, where they used Visquick.

11

¶22. On cross, Case testified similarly to Elsie regarding Larry's smoking—he said Larry quit smoking around 1979 or 1980, despite testifying in an earlier deposition that Larry quit twelve to fifteen years before he died and the physician's records from 1986. Case acknowledged that there were warnings[6] on the Flosal and Shurlift bags, but he did not read them. Case explained that he and Larry worked on the same rig when they worked for Barnwell and Reading & Bates, but they worked different shifts. Larry was a toolpusher when he worked for Big Chief, so he was "further away" from mixing the mud.

¶23. And Case also said that he could not remember any of the names of the drilling mud additives at Barnwell, Reading & Bates or Big Chief. When defense counsel said "You remember seeing [the drilling additives]. But, in all honesty, you can't remember where you saw them. Fair?," Case replied "Fair." In fact, Case said he did not remember whether they used asbestos chemical additives at Big Chief, because "[b]ack then we didn't care." Case did reiterate that, to the best of his knowledge, they used Flosal and Visbestos additives at Helmerich & Payne, where the job lasted nine months.

¶24. Larry ultimately was the assistant drilling superintendent at Delta Drilling, where he was removed from the work of the floor hands who handled the majority of the mixing work. Case worked on several rigs during his time at Delta Drilling, and he could not remember which specific products they used on which rig. Case remembered seeing Flosal, Visbestos and IMCO sacks and recognized them, but he could not say "which job they were on." And

---

[6]One of the warnings said "Caution. Contains asbestos fibers. Avoid creating dust. Breathing asbestos dust may cause serious bodily harm."

while he could not say exactly where they used Flosal, Super Visbestos, Visquick, Visbestos, he was "sure" they used them.

¶25.   Counsel for UCC introduced a mud engineer's report from one of the rigs where Case worked at Delta Drilling. None of the products Case had identified in his testimony appeared in the report. UCC's counsel also introduced a CD containing thousands of pages of records from one of the mud companies that operated rigs in Mississippi and indicated that only a handful included any mention of Visbestos or Super Visbestos.

Billy Jack Graves

¶26.   Graves testified that he worked with Larry on Delta Rig 56 for about three months in 1976. Graves said that he mixed Visbestos, Flosal, Shurlift, Super Best and Visquick while working on Rig 56. Graves was a floor hand and Larry was the toolpusher—Larry was "over the whole rig." Graves said that Larry worked "all the time. He would get relief like every 30 days for four or five days." Other than those four or five days, Larry was on the rig site twenty-four hours a day.

¶27.   Larry would come and watch Graves pour the asbestos products into the "hopper."[7] Graves said that "[a] lot of times [Larry] would be standing right there by me when I dumped it [the products] in there." Graves said it might take one hundred, fifty-pound bags of the products when they would "initially start the mud." It would take from fifteen to twenty-five bags when they would mix mud for a sweep to bring cuttings to the top. Sometimes Larry would pour the additives into the hopper himself if someone needed a break. Graves said

---

[7]Graves described the "hopper" as basically a barrel, where the floor hands would mix the drilling mud additives before they would be added to the mud tank.

13

that this process was "extremely dusty. There was dust everywhere. It got all in your eyes. It got on your clothes. It got in your nose. It was everywhere."

¶28. On cross, counsel for UCC again referenced the mud company's records for the time period that Graves said he had worked with Larry on Rig 56. Graves acknowledged that the products he had identified were not on the list, but he "remember[ed] putting [the products] in that hopper on that rig at Delta. . . . My testimony is we used those products." Defense counsel also referenced a mud company catalog, and Graves acknowledged that none of the products he had identified were listed in the catalog. But he maintained that he had used those asbestos products on Rig 56: "I don't see it right down there [in the catalog], no, sir. But we put – I know we put [the products] in that hopper at Delta. We can be here all day, but my testimony is not going to change about that."

Denver Anding

¶29. Portions of Anding's deposition testimony were read to the jury. Anding worked with Larry for about four months in the late 1960s for Marlin Drilling Company. He and Larry worked opposite shifts and were on different crews. Larry worked in the mud room, but Anding was not in the mud room with him because they worked different shifts. Anding said that Larry used an asbestos product when he mixed mud called "flo-something,"[8] and that he used it "just about every day." Anding testified that Larry could have used "hundreds" of bags of the "flo" material, but that he could not say exactly how much he used. Anding personally saw Larry mixing the "flo" material at least five times. Anding had seen

---

[8]Anding referred to this product as "Florite," Flomide," and Flosal during his deposition, before ultimately determining that it was Flosal.

14

Visbestos and Super Visbestos on the rig, but he could not say that it was when Larry worked there.

¶30.     Marlin warned the employees about the dangers of caustic soda, but it did not warn them about any of the other products that they used.  Nor did Marlin require the employees to wear any safety equipment besides hard hats and steel-toed boots.  Anding never saw Larry wear a respirator or a dust mask while he worked with the asbestos products, and Anding was never provided a respirator.  There was a fan in the mud room, but "all it was doing [was] just stirring that stuff [the mixing dust] up."

Joe Fitzhugh

¶31.     Joe Fitzhugh's video deposition was played for the jury.  Fitzhugh worked with Larry at Reading & Bates in the late 1960s for about four months.  He also worked around that time with Larry at Big Chief Drilling for approximately one year.  He and Larry mixed mud at Reading & Bates, and they used Flosal, Visbestos and Visquick.  This process was "always dusty."  Like at Reading & Bates, Fitzhugh and Larry mixed mud at Big Chief, using Flosal, Visbestos and Visquick.  Sometimes they would mix mud once a day, and they used "[p]robably around three hundred" bags of the asbestos products when they were "spudding in"—i.e., when they first began drilling the well.  They were never provided respirators or masks.

¶32.     On cross, defense counsel offered Fitzhugh's "social security statement" into evidence.  Defense counsel pointed out that the social security records indicated that Fitzhugh worked for Reading & Bates in 1966, while Larry worked there in 1967.  But when

15

defense counsel asked "[t]hese records reflect then, sir, that you did not work at Reading & Bates at the same time as Larry Smith, correct?," Fitzhugh responded, "I did, too." Similarly, the records indicated that Larry worked for Big Chief in 1968 and 1969, while Fitzhugh worked for Big Chief for only a couple of days in 1969. But again, Fitzhugh did not agree with the records.

¶33. Fitzhugh acknowledged that he could not describe what the asbestos products he had identified looked like. He also could not recall how many bags of the products that he and Larry had carried or used; they did not use the products every day. Fitzhugh could not describe what Larry looked like.

¶34. As detailed above, the special master and the trial judge focused solely on these four coworkers' testimony and concluded that Smith had not provided sufficient evidence to support the exposure factor of proximate cause, and that the JNOV therefore should be reaffirmed. We disagree.

¶35. First, the standard of review here is crucial. When the defendants moved for JNOV, the trial judge was to consider all of the evidence—not just the evidence which supported Smith's case—in the light most favorable to her. He also was to give Smith the benefit of all favorable inferences that reasonably might be drawn from the evidence. If those facts and inferences pointed so overwhelmingly in the defendants' favor that reasonable jurors could not have arrived at a contrary verdict, then the trial judge was correct to grant the motion. But "'if there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fairminded [jurors] in the exercise of impartial judgment

16

might reach different conclusions, *the motion should be denied and the jury's verdict allowed to stand*.'" **Smith I**, 130 So. 3d at 68. (citation omitted) (emphasis added). And this Court reviews a trial judge's grant of a motion for JNOV *de novo*. **Id.**

¶36. With that exacting standard in mind, we find that Smith presented sufficient evidence of Larry's exposure to the defendants' asbestos products, such that "reasonable and fair minded jurors in the exercise of impartial judgment might reach different conclusions." As such, the trial judge should have denied the defendants' motion on this issue. Case testified that he worked with Larry "off and on" for almost twenty-five years. Larry mixed drilling mud, which contained the defendants' asbestos products. Specifically, Case identified Flosal, Super Visbestos, Visbestos, Shurlift and Visquick. Case said that mixing mud was a dusty process, and that neither he nor Larry used a respirator.

¶37. Graves testified that he worked with Larry for three months on Delta Rig 56. Graves said that he mixed Visbestos, Flosal, Shurlift, Super Best and Visquick while working on Rig 56, and he also said that Larry worked "all the time." Anding testified that he worked with Larry for about four months, and that Larry used Flosal "just about every day." Anding also said that Larry could have used "hundreds" of bags of Flosal, and that he personally saw Larry mixing with it at least five times.

¶38. And finally, Fitzhugh testified that he worked with Larry for about sixteen months, and that they used Flosal, Visbestos and Visquick. The mud process was "always dusty." Fitzhugh said that sometimes they would mix mud once a day, and that they used "[p]robably around three hundred" bags of the asbestos products when they were "spudding in"—i.e.,

17

when they first began drilling the well. Fitzhugh also said that they never were provided respirators or masks.

¶39. In *Holmes*, this Court addressed a defendant's argument that the plaintiff had failed to provide sufficient evidence of causation. *Holmes*, 171 So. 3d at 451. Holmes had filed suit for silicosis-related injuries allegedly caused by the defendant's defective respirator. *Id.* at 445. Although this Court ultimately ruled in favor of the defendant on some issues, it also found that Holmes sufficiently had proven exposure to an unsafe dose of respirable silica:

> In the instant case, we find MSA's argument that Holmes failed to provide sufficient evidence of [exposure] is without merit. While Holmes failed to offer any direct evidence of the level of exposure, under our holding in *Pevey*, he is not required to. *Pevey*, 317 So. 2d at 408. A plaintiff may show an unsafe exposure or dose through circumstantial evidence, so long as that evidence is reliable. *Pevey*, 317 So.2d at 408; *see also Sherwin–Williams Co.*, 75 So. 3d at 41.

> Here, Holmes offered evidence of extremely dusty work conditions. There was also testimony that concrete contains silica, though no one knows the exact makeup of the concrete Holmes broke up.

*Holmes*, 171 So. 3d at 451.

¶40. In short, we find that Elsie presented sufficient evidence from which a reasonable juror could find that Larry was actually exposed to the defendants' products to a sufficient degree such that those particular products could have been a proximate cause of Larry's lung cancer.[9] In fact, the special master said as much during his recommendation, before inexplicably concluding that the JNOV should be reaffirmed: "Considering the evidence as

---

[9]We note that one of the plaintiffs' experts opined that a four-month period mixing mud was "undoubtedly a sufficient exposure to cause lung cancer." But again, we leave any issues about the overall sufficiency of the medical testimony to the trial judge upon remand.

18

a whole under the proper standards for JNOV, I would say it is, at best, a close question, and then only if one gives the non-movant the benefit of all reasonable inferences." As quoted above, a trial judge is *required* to give the nonmovant the benefit of all reasonable inferences.

¶41.    The defendants argue extensively that the co-workers' testimony was so weakened during cross-examination that no reasonable juror could believe them. But we are not convinced. There is nothing inherently infallible about social security records or a company's business records. And this Court repeatedly has said that the jury is the sole judge of a witness's credibility when the evidence is conflicting. *See, e.g.*, ***Roop v. Southern Pharm. Corp***, 188 So. 3d 1179, 1190 (Miss. 2016). As such, the jury members were free to accept the coworkers' testimony that they worked with Larry and that they used those specific products, despite the evidence to the contrary presented by the defendants. We therefore reverse the trial judge's reaffirmance of the JNOV.

### III.  Defendants' Cross-Appeals and Elsie's Motion to Strike

¶42.    Chevron and UCC[10] have filed cross-appeals, presenting several different issues,[11] and Elsie has filed a motion to strike the cross-appeals.[12] She argues that the defendants' "right

---

[10]Montello joined in UCC's briefs.

[11]Chevron argues (1) that it is entitled to a new trial because the trial court made "multiple errors" in the jury instructions and during jury selection; (2) alternatively, that it is entitled to a remittitur; and (3) alternatively, that the statutory noneconomic damages cap should be applied. UCC argues that it is entitled to a new trial because (1) the trial court erroneously instructed the jury; (2) Smith County was an improper venue; (3) the verdict was against the overwhelming weight of the evidence; (4) the allocation of fault was contrary to the undisputed evidence; and (5) one of the jurors should have been excluded.

[12]Smith asks this Court to "strike the cross-appeals and briefings of [the defendants] with respect to the unconditional denial of their motion for new trial, issues designated

to appeal the unconditional denial of their motion for new trial expired in 2010 when no cross-appeal was filed[.]" We disagree.

¶43. In *Dunn v. Dunn*, this Court addressed—for the first time— the issue of when a party must file a cross-appeal. *Dunn v. Dunn*, 853 So. 2d 1150, 1152 (Miss. 2003). After reviewing authority from several other jurisdictions, this Court concluded

> that an appellee should not be required to file a cross-appeal unless he or she is aggrieved by the trial court's judgment. Because Judy won a favorable judgment in the chancery court, *her position on appeal was to have this Court affirm the judgment. She did not seek to alter or reverse the judgment below.* Therefore, she was not required to raise any issues on cross-appeal.

*Id.* (emphasis added). This is the precise scenario here. Elsie's sole issue in her first appeal was that the trial court erred when he granted the defendants' motion for JNOV. The defendants' "position on appeal was to have this Court affirm [that] judgment." And although the defendants now advance several other arguments in their cross-appeals, at the time of Elsie's first appeal, they "did not seek to alter or reverse the judgment below." So we conclude that the defendants are not barred from pursuing their cross-appeals here, because they were not required to file cross-appeals in *Smith I*. We therefore deny Elsie's motion to strike.

¶44. But although we deny Elsie's motion to strike, we also decline to address the issues raised by defendants' cross-appeals for the reasons discussed above. In short, because the trial judge did not address any of the other arguments that the defendants reasserted after this Court's decision in *Smith I* (and raise here in their briefs and in their cross-appeals), we

---

thereunder and remittitur."

20

remand this case to the trial judge so that he may rule on any of those issues that he finds are still outstanding.

## CONCLUSION

¶45.    We reverse the trial judge's order reaffirming JNOV and remand.  The trial judge reaffirmed JNOV for the sole reason that Elsie presented insufficient evidence of Larry's exposure to the defendants' asbestos products.  But we find that Smith did present sufficient evidence to make the exposure issue a question for the jury.  And because the trial judge did not address any of the other arguments that the defendants reasserted after this Court's decision in *Smith I*, we decline to address any of the other issues raised in the briefing and in the defendants' cross-appeals and remand this case to the trial judge so that he may rule on any of those issues that he finds are still outstanding.  We also deny Elsie's motion to strike the defendants' cross-appeals.

¶46.    **REVERSED AND REMANDED.**

**WALLER, C.J., DICKINSON, P.J., KITCHENS, KING, COLEMAN, MAXWELL AND BEAM, JJ., CONCUR. RANDOLPH, P.J., NOT PARTICIPATING.**

21