# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-10223

United States Court of Appeals
Fifth Circuit

**FILED**
February 14, 2019

Lyle W. Cayce
Clerk

DELBERT JOHNSON,

> Plaintiff - Appellee

v.

JEFFREY HALSTEAD, individually,

> Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Texas

ON PETITION FOR REHEARING AND REHEARING EN BANC

Before HIGGINBOTHAM, DENNIS, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

The petition for rehearing is DENIED and no member of this panel nor judge in active service having requested that the court be polled on rehearing en banc, the petition for rehearing en banc is also DENIED. The following is substituted in place of our opinion.

Delbert Johnson is a sergeant with the Fort Worth Police Department. He alleges that over a three-year period he was subjected to a campaign of isolation, harassment, and ridicule because he is African-American. Investigators hired by the City to look into Johnson's complaint (and those of two other officers) agree with the sergeant. Their report found that Johnson

## No. 17-10223

was "repeatedly subjected to behavior that was hostile, intimidating, and[] bullying, and it was done publicly over a period of more than three years." It also concluded that although Johnson reported the harassment to upper management, including Chief of Police Jeffrey Halstead, the Department "did not step forward to stop the conflict—allowing the continuation of behavior contributing to 'hostile work environment' conditions." Instead, Halsted transferred Johnson to one of the worst shifts in the department. We decide whether Johnson has alleged enough at the pleading stage to overcome Chief Halstead's qualified immunity defense to claims of hostile work environment and retaliation.

## I.

Johnson has been a police officer in Fort Worth since 1990.[1] He served in multiple roles until being promoted to sergeant and assigned to Traffic Division in 2005. Several years later, Johnson—Traffic Division's only African-American supervisor—was approached by an African-American officer about an offensive picture found in the office. The picture, taken by Sergeant Mike Cagle, depicted Sergeant Ann Gates holding a noose around a snowman's neck. An unspecified officer, not Johnson, reported the picture to Internal Affairs. IA determined that Gates and Cagle had violated Department policies and punished them with a Commander's Admonishment.

Unhappy over the admonishment of his colleagues, Sergeant David Stamp began to take actions to isolate and undermine Johnson. Stamp allegedly gathered a group of supervisors within the Traffic Division and told them that they should "watch out for and avoid [Sergeant] Johnson . . . who

---

[1] The factual allegations in this case come from Johnson's first amended complaint, and his Rule 7 reply. The order being appealed is a judgment on the pleadings, thus "all well-pleaded facts are accepted as true and viewed in the light most favorable to the plaintiff." *Bosarge v. Miss. Bureau of Narcotics*, 796 F.3d 435, 439 (5th Cir. 2015).

was now their enemy and could not be trusted." Stamp also publicly criticized Johnson to other supervisors, officers, and civilian employees; conspired with others to boycott certain meetings and assignments overseen by Johnson; and attempted to sabotage one of Johnson's assignments by trying to convince other officers not to work on a federal grant Johnson managed.

Two years after this conduct began, Stamp sent an anonymous letter to Chief Halstead accusing Johnson of stealing money from that same grant program. As a result of Stamp's letter, three different investigative teams audited the federal grant, all of them failing to find any evidence of wrongdoing. One of the investigators told Johnson, "S[ergeant] Stamp tried to take you down hard." Once Johnson was cleared of any wrongdoing, Stamp reportedly said that "the only reason that S[ergeant] Johnson was not arrested was because he was black."

But Stamp is not a party to this lawsuit; it is against Halstead. Johnson's claims hinge on Halstead's alleged retaliation and his response to the discriminatory environment. Johnson first met with Halstead after filing a complaint with human resources in which he alleged "pervasive race discrimination." Johnson filed several follow up complaints, and after 37 days, he met with Halstead to discuss the alleged discrimination. Halstead told Johnson that he had "failed him" and would "make it right."

Three months after they met, Halstead transferred Johnson from the day shift in Traffic Division, where Johnson had been for eight years, to Second Shift West Division, which Johnson describes as "one of the worst shifts in the entire police department." Johnson's work hours changed from 6:00 am to 2:00 pm, Monday through Friday, to 4:00 p.m. to 2:00 a.m., Friday through Monday. Johnson contends that this change to the evening shift had a negative effect on his social relationships and cost him $50,000 in lost income because it

3

diminished opportunities for overtime and forced him to leave a part-time job that he had held for 11 years.

Several weeks before being transferred, Johnson had applied for an open position as Jail Sergeant. The hiring official allegedly wanted to hire Johnson, and no one else applied for the position. But Halstead and upper-level officials blocked Johnson from the position and removed the job posting even though no one had filled it.

During this time, Lieutenant Glenn Edney and the Fort Worth Black Police Officers Association filed complaints with the Department alleging race-based discrimination and retaliatory treatment by supervisory and senior-level officials. Once informed of the complaints, the City of Fort Worth responded by hiring Coleman & Associates to perform an independent investigation of the three complaints, including Johnson's. After ten months of investigation, Coleman released a report finding that the Department "tolerated and allowed a hostile work environment over a three year time period that was based on race and retaliation for [Johnson's] prior complaints of race discrimination and harassment."

Following the release of the report, Halstead posted a video to the Department's YouTube channel in which he recognized that Johnson and another officer had been discriminated against on the basis of race and apologized for that treatment. Halstead also transferred Johnson back to the day shift in Traffic Division.

The Coleman report cites several examples of statements made by Halstead accepting responsibility for the discriminatory behavior. It also found that the discriminatory behavior was "demonstrated with the knowledge of supervisors, other employees in the Traffic Division, and the department's Chain of Command." That included "top management," which "knew of the conflict between Complainant 1 [Johnson] and A-One [Stamp] but did not

No. 17-10223

intercede to successfully mitigate the disruptive and disparaging conflict." The Report concluded that "[t]he insulting, demeaning and offensive behavior from A-One directed toward [Johnson] continued, in part because the department leadership failed to take directed action as required by" Department policies.

Johnson sued Halstead in his individual capacity, the City, and Halstead's successor in her official capacity as Police Chief. He asserted civil rights claims under sections 1981 and 1983 for race discrimination, hostile work environment, and retaliation. Halstead invoked qualified immunity, and the court ordered Johnson to file a Rule 7 reply to address that defense. Halstead then filed a motion for judgment on the pleadings, which the court granted in part and denied in part. It dismissed Johnson's claims for racial discrimination "to the extent [they were] based on Halstead's own alleged acts of harassment." But the court allowed Johnson to move forward with his claims for: (1) hostile work environment based on a theory of supervisory liability; (2) retaliation under section 1981 in response to Johnson's complaint about the discrimination; and (3) First Amendment retaliation.

## II.

We review the denial of a Rule 12(c) motion for judgment on the pleadings asserting qualified immunity de novo. *Bosarge v. Miss. Bureau of Narcotics*, 796 F.3d 435, 439 (5th Cir. 2015). A "plausibility" standard determines whether the plaintiff has pled sufficient facts to defeat a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When the defendant asserts qualified immunity, the court can order the plaintiff to submit a reply, refuting the immunity claim "with factual detail and particularity." *DeLeon v. City of Dallas*, 141 F. App'x 258, 261 (5th Cir. 2005); *see also Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir. 1995) (en banc). This reply "must be tailored to the assertion of qualified immunity and fairly engage its allegations." *Schultea*, 47 F.3d at 1433.

5

No. 17-10223

To overcome qualified immunity, a plaintiff must show two things: (1) that the allegations make out a constitutional violation, and (2) that the violation of rights was clearly established at the time of the defendant's conduct. *Carroll v. Ellington*, 800 F.3d 154, 169 (5th Cir. 2015).

III.

The district court denied Halstead qualified immunity on Johnson's hostile work environment claim but limited the claim to a theory of supervisory liability. A supervisor can be liable for the hostile work environment created by his subordinates "if that official, by action or inaction, demonstrates a deliberate indifference to a plaintiff's constitutional rights." *Southard v. Tex. Bd. of Criminal Justice*, 114 F.3d 539, 551 (5th Cir. 1997).

We first address Halstead's contention that there is a clear legal obstacle to this section 1983 claim. He argues that although a hostile work environment based on sex violates the Equal Protection Clause, it is not clearly established that one based on race does. This ignores multiple cases in which we have considered race-based hostile work environment claims asserted under section 1983. *See Duru v. City of Houston*, 1994 WL 399211, at *2 (5th Cir. Jul. 22, 1994) (denying qualified immunity for creating a racially hostile work environment which violates a clearly established section 1983 right)[2]; *Caldwell v. Lozano*, 689 F. App'x 315, 322 (5th Cir. 2017) (evaluating a race-based hostile work environment claim under section 1983 but finding insufficient severity or pervasiveness); *Mendoza v. Helicopter*, 548 F. App'x 127, 129 (5th Cir. 2013) (applying Title VII sexual harassment cases to a claim of a racially hostile work environment under section 1983). And the reason we have given for allowing constitutional claims of sex-based harassment—that

---

[2] "Unpublished opinions issued before January 1, 1996, are precedent." 5TH CIR. R. 47.5.3.

No. 17-10223

"Section 1983 and [T]itle VII are 'parallel causes of action,'" *Lauderdale v. Tex. Dep't of Criminal Justice, Institutional Div.*, 512 F.3d 157, 166 (5th Cir. 2007) (quoting *Cervantez v. Bexar Cty. Civil Serv.*, 99 F.3d 730, 734 (5th Cir. 1996))—applies equally to race-based claims. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 n.1 (1998) ("Although racial and sexual harassment will often take different forms, and standards may not be entirely interchangeable, we think there is good sense in seeking generally to harmonize the standards of what amounts to actionable harassment."). Indeed, the first case recognizing Title VII liability for a hostile environment was one from our court involving discrimination against a Hispanic worker. *Rogers v. EEOC*, 454 F.2d 234 (5th Cir. 1971); *see also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) (noting that courts applied the *Rogers* holding to harassment based on race, religion, and national origin before the EEOC issued a Guideline in 1980 recognizing a claim for sex-based harassment). Even without all this caselaw, it would necessarily follow that if the Constitution makes it unlawful to create a hostile workplace in response to a public employee's sex, then it is also unlawful to engage in that hostility in response to a worker's race. After all, the latter category of discrimination is subject to even more exacting constitutional scrutiny than the former. *Clark v. Jeter*, 486 U.S. 456, 461 (1988).

Given that the Equal Protection Clause protects against a racially hostile work environment, the question becomes whether Johnson has sufficiently alleged that was what he faced. A hostile work environment exists when the workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quotation omitted). This last requirement, whether the harassment impacts the "'terms'

or 'conditions' of employment," is key as it comes from the words of Title VII. *Id.* at 25 (Ginsburg, J., concurring) (citing 42 U.S.C. § 2000e-2(a)(1)).

Johnson sufficiently alleges sustained harassment that undermined his ability to work. Relying on the Coleman Report, Johnson contends that he was "repeatedly subjected to behavior that was hostile, intimidating, and[] bullying, and it was done publicly over a period of more than three years." More specifically, he endured "false accusations of wrong doing, name calling, campaigning to turn others against [him], encouraging [his] peers and direct reports not to work with [him], or for [him] thereby marginalizing and undermining his supervisory effectiveness." The Coleman Report recounts that there were occasions when the tension between Johnson and Stamp was "so intense that the potential for physical aggression and altercation appeared imminent." It concluded that "race was at the core of the differences" in this conflict. And Halstead publicly admitted not only that harassment occurred, but also that it resulted from Johnson's "skin color."

These allegations go well beyond "simple teasing, offhand comments, and isolated incidents." *Faragher*, 524 U.S. at 788 (cleaned up). They allege a lengthier period of harassment than other verbal abuse that we have found was pervasive enough to create a hostile work environment. *See E.E.O.C. v. WC&M Enters., Inc.*, 496 F.3d 393, 400 (5th Cir. 2007) (finding genuine issue of material fact as to existence of hostile work environment when plaintiff was "subjected to verbal harassment on a regular basis for a period of approximately one year"); *see also Walker v. Thompson*, 214 F.3d 615, 626–27 (5th Cir. 2000) (also finding a fact issue when African-American employees were subjected to a variety of racial slurs over three-year period), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). Most of all, Johnson provides concrete examples of how the racial intimidation "interfere[d] with [his] work performance." *See Harris*, 510 U.S. at 23. The

racial hostility led to officers' boycotting meetings with Johnson and ignoring his assignments; colleagues' refusing to assist with the grant program Johnson oversaw; and Johnson's being investigated for fraud.  Johnson has alleged a plausible claim of hostile work environment, and one that is apparent from clearly established law.  If those allegations are not plausible when they are corroborated by investigators the employer hired, it is tough to imagine when they will ever be.

But for Halstead to be liable, it is not enough that Johnson was subject to a hostile work environment.  Halstead must have been deliberately indifferent to this racially hostile work environment.  *Southard*, 114 F.3d at 551 (citing *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 454 (5th Cir. 1994) (en banc)).  This is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* (quoting *Bd. of the Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 410 (1997)).  Johnson thus must allege that "repeated complaints of civil rights violations" were followed by "no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995).

He has done so.   There is no dispute that Halstead knew about the alleged harassment.  Johnson says he met with Halstead soon after he filed the complaint with HR.  The subsequent transfer of Johnson and Halstead's later apology corroborate this.  So does the Coleman Report, as it found that a "high ranking officer" confirmed Johnson's account of his interactions with the Police Chief.  The investigators also concluded that there was "widespread knowledge" of Johnson's situation, and that the "Chain of Command" knew about the "hostile, intimidating, and bullying" behavior.

Johnson's allegations that Halstead did nothing to try and stop the harassment even though he knew about it—again corroborated by the outside

9

investigation—also satisfy the second requirement for deliberate indifference. Among its sharp criticisms of management's response to the harassment complaints, the Coleman Report concludes that "upper management was aware of the ongoing nature of the matter, but did not step forward to stop the conflict—allowing the continuation of behavior contributing to a 'hostile work environment.'" Addressing Stamp's harassment of Johnson, it found that "the insulting, demeaning and offensive behavior . . . continued, in part because the department leadership failed to take directed action" as required by Department policy.    Although these findings refer to "top" or "upper" management rather than Halstead specifically, it is easy to piece together that the very top of management is included among the group that made no attempt to stop the harassment.   As discussed, Johnson told Halstead about the harassment.   Halstead admitted to Johnson that he had "failed him" and promised to "make it right."   More than a year later, Halstead publicly admitted that he had not made it right and had instead continued in his failure to prevent the hostile conduct he had learned about.   The corroborated allegations of Halstead's inaction after learning about the unconstitutional work environment is the definition of deliberate indifference and thus would amount, if proven, to a violation of clearly established law.  Of course, they are just allegations at this point, and the evidence may end up showing the opposite.  But the allegations are plausible enough to allow Johnson to engage in the full discovery process and find out if there is evidence to back them up.

IV.

We next consider the section 1981 claim asserting that Halstead retaliated after Johnson complained about discrimination by transferring him to the night shift in a different division.  Halstead argues he is entitled to qualified immunity because it is not established that the transfer was an

No. 17-10223

adverse employment action and Johnson has not sufficiently pleaded causation.[3]

The district court seems to have concluded that the transfer amounted to an adverse action under the "ultimate employment decision" standard that governs discrimination claims. But retaliation claims are governed by a less stringent standard. Title VII retaliation plaintiffs need only be subject to an employment decision that was "materially adverse," which means that it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) (cleaned up).

Halstead suggests it is not clear whether this "materially adverse" standard applies to retaliation claims brought under section 1981. We do not view that as an open question. For starters, we have repeatedly explained that "[r]etaliation claims under § 1981 and Title VII . . . are parallel causes of action," which means they "require[] proof of the same elements in order to establish liability." *Foley v. Univ. of Hous. Sys.*, 355 F.3d 333, 340 n.8 (5th Cir. 2003); *see also Raggs v. Mississippi Power & Light Co.*, 278 F.3d 463, 468 (5th Cir. 2002) ("This Court considers claims of intentional discrimination, which include racial discrimination and retaliation claims based on Title VII and 42 U.S.C. § 1981, under the same rubric of analysis."). Applying that principle,

---

[3] Halstead argues for the first time at the rehearing stage that it is not clearly established that a section 1981 retaliation claim can be brought against a municipal official as opposed to the municipality itself. *See Jones v. City of Houston*, No. 18-20223, 2018 WL 6131132, at *5 n.6 (5th Cir. Nov. 20, 2018) (not deciding "whether § 1981 claims are cognizable against government officials in their individual capacities" in light of "tension" in our caselaw on the question (citing *Foley v. Univ. of Hous Sys.*, 355 F.3d 333, 338 (5th Cir. 2003)); *see also Oden v. Oktibbeha Cty., Miss*, 246 F.3d 458, 464 & n.5 (5th Cir. 2001). Because Halstead did not raise this issue in the district court or before the panel, we will not consider it in a petition for rehearing. Halstead's failure to raise the "individual defendant" question also means that this opinion is not precedent on that issue. *See Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided.").

we readily concluded that *Burlington Northern*'s "materially adverse" standard governs a section 1981 retaliation claim.  *See Mendoza*, 548 F. App'x at 129–30.  Granted, *Mendoza* is not published and was decided a few months after Johnson's transfer.  But in viewing application of *Burlington Northern* to section 1981 as so straightforward—it just took reciting the principle that "the law regarding his § 1981 retaliation claims tracks the Title VII jurisprudence"—*Mendoza* shows that the adverse action standard is an obvious consequence of our repeated command to analyze Title VII and section 1981 retaliation claims in sync.  *Cf. Hanks v. Rogers*, 853 F.3d 738, 747 (5th Cir. 2017) (recognizing that there is no immunity defense when a constitutional violation is "obvious").  If that is not enough, a robust consensus of persuasive authority existed on this question at the time of Johnson's transfer, as six circuits by then had applied the "materially adverse" standard to section 1981.  *See Douglass v. Rochester City Sch. Dist.*, 522 F. App'x 5, 8 (2d Cir. 2013); *Estate of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 798 (3d Cir. 2010); *Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 848–49 (7th Cir. 2007); *Wright v. St. Vincent Health Sys.*, 730 F.3d 732, 737 (8th Cir. 2013); *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011); *Jackson v. Hall Cty. Gov't*, 518 F. App'x 771, 773 (11th Cir. 2013).

We thus need not decide if the transfer was tantamount to a demotion, which is often needed to treat a transfer as an "ultimate employment decision." To be actionable when it is a product of retaliation, an employment decision need only "dissuade[] a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68.  Under this less demanding standard, "a lateral reassignment to a position with equal pay could amount to a materially adverse action in some circumstances."  *See Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 485 (5th Cir. 2008).  A shift change in and of itself is probably not sufficient.  *See Lushute v. Louisiana,*

No. 17-10223

*Dep't of Soc. Servs.*, 479 F. App'x 553, 555 (5th Cir. 2012) (shift change was not an adverse employment action when plaintiff was changed from a four-day week to a five-day week with no change in total hours or compensation).  But a retaliatory shift change that places a substantial burden on the plaintiff, such as significant interference with outside responsibilities or drastically and objectively less desirable hours, can dissuade an employee from reporting discrimination.  *See Ginger v. District of Columbia,* 527 F.3d 1340, 1344 (D.C. Cir. 2008) (finding potential Title VII retaliation when police officers were switched from a permanent shift to a rotating shift because the change "severely affected [the officers'] sleep schedules and made it more difficult for them to work overtime and part-time day jobs"); *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005) (finding lateral transfer requiring normal 9-to-5 schedule could be materially adverse when prior flex-time hours were necessary for plaintiff to care for her son with Down syndrome).

Johnson alleges that substantial burdens flowed from the shift change. He went from a daytime shift during the week to a night shift on the weekend. Just in terms of that timing, either hours or days, the shift change could dissuade an officer from making a discrimination complaint.  But Johnson also describes his new assignment as "one of the worst shifts in the entire police department," and it is not surprising that weekend evenings might be among the more demanding assignments for a police officer.  He also cites a significant financial loss of $50,000 because he had to quit a part-time job he had held for 11 years and no longer got the opportunity to work overtime hours.  The district court found these allegations sufficient to show an ultimate employment decision. We have no trouble finding that they could support the lesser threshold of a "materially adverse" action, and that the widely acknowledged inferiority of the new shift would have been apparent to any reasonable person making the decision.

No. 17-10223

Johnson must also show it is plausible that he was transferred because he complained about discrimination. He has done so. Shortly after alleging a pattern and practice of race discrimination to human resources, Johnson personally met with Halstead to discuss his concerns. Three months later, Halstead transferred Johnson from the position he had held for eight years. This relatively short time gap between his complaint and the transfer support an allegation that the two events were related. *See Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (noting that a "time lapse of up to four months" may be sufficient to establish a causal connection even at the post-discovery summary judgment stage (quoting *Weeks v. NationsBank, N.A.*, 2000 WL 341257, at *3 (N.D. Tex. 2000))). So does Halstead's decision to return Johnson to his old shift immediately after the release of the Coleman Report. And the report recognized that Johnson's transfer out of the Traffic Division was part of "the department's response to [his] complaint of harassment."[4]

Johnson's allegations supporting unlawful retaliation, if he later proves them to be true, establish a violation of his constitutional rights, one that a reasonable official would know was unlawful. The district court properly denied Halstead's motion to dismiss this claim.

---

[4] Halstead's petition for rehearing en banc argues that this discussion of causation for the section 1981 retaliation claim fails to apply the "clearly established" qualified immunity standard. But that standard asks whether a "*right* was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (emphasis added). It does not require that causation be clearly established. Indeed, Halstead cites no case requiring a heightened showing of causation in qualified immunity cases.

What is more, in challenging causation Halstead relies on cases addressing the *McDonnell Douglas* prima facie showing used at summary judgment when a plaintiff tries to prove retaliation with circumstantial evidence. At the pleading stage, the question is whether the allegation is plausible. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (explaining that the *McDonnell Douglas* framework used for evaluating circumstantial evidence at summary judgment does not apply at the pleading stage).

No. 17-10223

V.

Johnson alleges a second retaliation claim, this one under the First Amendment. It is also based on Halstead's alleged response to Johnson's complaint about the racially hostile work environment, which Johnson characterizes as protected speech. Unlike the claim alleging retaliation for reporting discrimination, a claim of retaliation for exercising First Amendment rights exists only if Johnson was making the statement as a citizen on a matter of public concern.[5] *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006); *Gibson v. Kilpatrick*, 838 F.3d 476, 481 (5th Cir. 2016).

The district court correctly determined that Johnson's apprehensions about racial hostility within the police department are a matter of public concern. *See Markos v. City of Atlanta, Tex.*, 364 F.3d 567, 574 (5th Cir. 2004) (finding that "a public employee speaking out about alleged corruption in the police department" is "a subject undoubtedly of public concern"); *Branton v. City of Dallas*, 272 F.3d 730, 740 (5th Cir. 2001) ("Exposure of official misconduct, especially within the police department, is generally of great consequence to the public.").

But the district court did not consider the second question *Garcetti* asks: whether Johnson was speaking as a citizen. A public employee's speech is not protected when he speaks "pursuant to [his] official duties." *Anderson v. Valdez*, 845 F.3d 580, 592 (5th Cir. 2016). The reason is that when the

---

[5] We note that First Amendment retaliation claims also may differ from section 1981 retaliation over the definition of an "adverse employment action." It is not clearly established whether *Burlington*'s "materially adverse" standard applies to retaliation for protected speech. *See Gibson v. Kilpatrick*, 734 F.3d 395, 401 n.4 (5th Cir. 2013) ("[T]his court has not yet decided whether the *Burlington* standard for adverse employment actions also applies to First Amendment retaliation cases."), *vacated and remanded on other grounds*, 134 S. Ct. 2874 (2014); *DePree v. Saunders*, 588 F.3d 282, 288 (5th Cir. 2009) (finding that the application of *Burlington* to First Amendment retaliation is not "clearly established"). Because our decision is based on whether Johnson spoke as a citizen, we need not address whether his transfer would meet the stricter "ultimate employment action" test.

employee's speech merely relates to the employment relationship as might occur in a private workplace, the public employer should not face constitutional scrutiny for its responses. *Garcetti*, 547 U.S. at 418, 423  In determining whether an employee was speaking as part of his duties or had stepped outside that role to speak as a citizen and thus receive First Amendment protection, we consider "factors such as job descriptions, whether the employee communicated with coworkers or with supervisors, whether the speech resulted from special knowledge gained as an employee, and whether the speech was directed internally or externally." *Rogers v. City of Yoakum*, 660 F. App'x 279, 283 (5th Cir. 2016) (citing *Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008)).

One way to determine the role of the speaker is to look to the identity of the listener.  Complaints made publicly or to individuals outside the speaker's organization suggest the employee is acting as a citizen. *See Anderson*, 845 F.3d at 600 ("By at least 2014, it was clearly established that an employee's speech made externally concerning an event that was not within his or her job requirements was entitled to First Amendment protection." (cleaned up)); *Charles v. Grief*, 522 F.3d 508, 514 (5th Cir. 2008) (stating that an African-American who raised concerns about racial discrimination against himself and other minority employees of the Texas Lottery Commission engaged in protected speech because his complaints were made to Texas legislators rather than his supervisors).  But complaints made up the chain of command about conditions in a workplace are often held be found unprotected. *Gibson v. Kilpatrick*, 773 F.3d 661, 670 (5th Cir. 2014) (recognizing that "whether the employee's complaint [is] made within the chain of command or to an outside actor" is an important, but not dispositive, factor); *Davis*, 518 F.3d at 313 ("Cases from other circuits are consistent in holding that when a public employee raises complaints or concerns up the chain of command at his

workplace about his job duties, that speech is undertaken in the course of performing his job."). It thus is not clearly established that an internal complaint of discrimination made only to supervisors, primarily to vindicate one's own rights, qualifies as speech made as a "citizen" rather than as an "employee." *See Cutler v. Stephen F. Austin State Univ.*, 767 F.3d 462, 471–73 (5th Cir. 2014) (discussing the Fifth Circuit's development of First Amendment retaliation law for public employees after *Garcetti*). Halstead is therefore entitled to qualified immunity on the First Amendment retaliation claim.

\* \* \*

The district court's denial of qualified immunity is AFFIRMED on the hostile work environment and section 1981 claims, but REVERSED on the section 1983 First Amendment retaliation claim. The case is REMANDED for further proceedings.

17