# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 24, 2022

Lyle W. Cayce
Clerk

No. 20-60105

Melissa Rushing,

*Plaintiff—Appellant*,

*versus*

Mississippi Department of Child Protection Services; Jess Dickinson, *individual and official capacities*; Dana Spiers, *individual capacity*; Pamela Cross, *individual capacity*; Wendy Bryant, *individual capacity*; Tracy Malone, *individual capacity*; Kris Jones, *individual capacity*; John Does 1-10,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:18-CV-511

Before Wiener, Costa, and Willett, *Circuit Judges*.

Gregg Costa, *Circuit Judge*:*

Melissa Rushing was a social worker with the Mississippi Department of Child Protective Services (CPS). After several quarrels with her

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

colleagues and supervisors, Rushing was fired. She responded by suing the agency and its managers, alleging First Amendment retaliation and claims under Mississippi law. The district court granted summary judgment in defendants' favor. We affirm in part and vacate and remand to the district court in part.

I

Rushing worked for CPS as a social work supervisor from November 2016 to February 2018.[1] Defendants Dana Spiers and Pamela Cross were her direct supervisors and defendant Wendy Bryant was in upper management.

Rushing and her supervisors sparred repeatedly. Spiers and Cross criticized Rushing's job performance and accused her of putting at-risk children in harm's way. They also clashed about the work environment at CPS and accused each other of missing too much work. Spiers and Cross were especially troubled by Rushing's communications with the judge who oversaw the CPS docket. Early in Rushing's tenure, Cross considered firing her because she suspected that Rushing was sharing case details and personnel information with the judge. The suspicions were warranted: The judge liked to be kept in the loop on CPS management issues and Rushing routinely obliged her.

Of the numerous clashes between Rushing and other CPS employees, three are central to this appeal. First, in June 2017, Rushing discovered that a co-worker had falsified a hotel voucher for a work trip. Taking matters into her own hands, Rushing confronted the offending co-worker about the fraud. To ensure that her words would not later be misrepresented by the co-worker, Rushing asked a court-appointed guardian ad litem to witness the

---

[1] Rushing had a prior eight-year stint with CPS, which she ended for health reasons.

confrontation.  After Cross found out about the confrontation—which she considered a breach of agency confidentiality because of the presence of the ad litem—she sought approval from Bryant to formally reprimand Rushing. Bryant settled on giving Rushing less severe oral counseling instead.  During the same month, the supervisors grew concerned that Rushing had prematurely closed a case file on an unstable pregnant woman's assurances that she would give her child up for adoption when born.  The infant was reported to CPS and found underweight, sleeping without a proper crib, and in serious need of a diaper change.

Second, in late September 2017,[2] Rushing sent an unsigned "Call to Action" letter to "the judges, the board of social workers, the governor and lieutenant governor, the state legislators, state senators and representatives, and the justices of the supreme court."  In the letter, she expressed concern with many aspects of CPS leadership.  She also accused CPS of lying to clients, forging documents, and neglecting its duties to at-risk children.  CPS officials received the letter but maintain that they did not know who wrote it because it was unsigned.  The same week that CPS received the letter, Rushing had another misstep at work when she delayed acting on a report that a thirteen-year-old girl had been sexually assaulted.  Soon after, Cross and Bryant decided "to limit [Rushing's] case decision making."  They temporarily transferred her to a neighboring county, relieved her of supervisory duties, and made her an intake worker.

The final flare-up occurred around January 2018.  Rushing returned to her old office—this time in an inferior, nonsupervisory role—and again contacted the judge interested in internal CPS issues.  Rushing left the judge

_____

[2] The letter is not dated, but it seems to have been received around September 27–29.

a voicemail sharing that multiple CPS employees were dissatisfied and planning to leave the agency. Later, according to Bryant, Rushing denied leaving the message when her supervisors asked about it. Around the same time, Rushing contacted CPS Commissioner Jess Dickinson, stating that she was "tired of being retaliated against for whistle blowing on others" and requesting an appointment to discuss her concerns. In February 2018, CPS discharged Rushing. The initial termination letter states Rushing was "terminated without cause," but CPS maintains that it fired Rushing because she "communicated agency matters to persons outside the agency" and then "lied and denied having made the communication."

Rushing brought this lawsuit alleging that she was reprimanded, then transferred and demoted, and ultimately fired for exercising her First Amendment rights. She also alleges claims under the Mississippi doctrine of wrongful termination and the Mississippi Whistleblower Protection Act. The district court granted summary judgment for the defendants on all claims.

## II

We start with Rushing's First Amendment claims. Like private employers, public employers have an interest in regulating their employees' speech so that their offices remain conducive to work. *Lane v. Franks*, 573 U.S. 228, 236 (2014). So "when [an] employee's speech merely relates to the employment relationship as might occur in a private workplace, the public employer should not face constitutional scrutiny for its responses." *Johnson v. Halstead*, 916 F.3d 410, 422 (5th Cir. 2019).

But employees do not leave their First Amendment rights at the door when they enter a government workplace. *Id.* "[A] citizen who works for the government is nonetheless a citizen" who enjoys the rights that private citizens do. *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006). Moreover,

No. 20-60105

because public employees are in the best position to shed light on government maladies, the First Amendment recognizes that "[t]here is considerable value . . . in encouraging, rather than inhibiting" their speech. *Lane*, 573 U.S. at 236.

The First Amendment thus prevents public employers from retaliating against employees who exercise their free speech rights as private citizens. *Garcetti*, 547 U.S. at 419. To bring a First Amendment retaliation claim against a government employer, an employee must establish that she suffered an adverse employment action, she spoke as a citizen on a matter of public concern, she has a greater interest in the speech than the government has in the efficient provision of public services, and the speech caused the adverse employment action. *Nixon v. City of Houston*, 511 F.3d 494, 497 (5th Cir. 2007).

Rushing points to three independent actions of First Amendment retaliation: (1) the oral counseling she received after confronting her co-worker about falsifying a hotel voucher; (2) the temporary transfer to a less desirable position in another county; and (3) the ultimate termination of her employment. We take these incidents in turn.

A

Rushing alleges first that CPS retaliated against her with oral counseling—which she characterizes as "admonishment"—after she confronted her co-worker about the fraudulent hotel voucher. The first two elements of the retaliation test are at issue: whether Rushing spoke as a citizen on a matter of public concern when she confronted her co-worker and whether CPS's oral counseling was an adverse employment action. We need only resolve the first issue because we conclude that Rushing's speech was not protected.

The First Amendment protects speech by a public employee only when it is made "as a citizen." *Anderson v. Valdez*, 845 F.3d 580, 592 (5th Cir. 2016). If the speech is instead "pursuant to [the employee's] official duties," *id.*, "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Garcetti*, 547 U.S. at 418. Whether an employee speaks as a citizen or as part of his official duties—a question of law for the court to answer, *Corn v. Miss. Dep't of Pub. Safety*, 954 F.3d 268, 277 (5th Cir. 2020)—depends on several factors, key among them whether the speech was directed internally within the organization or externally to the public. *See Johnson*, 916 F.3d at 422 (citing *Rogers v. City of Yoakum*, 660 F. App'x 279, 283 (5th Cir. 2016)). Other factors include whether the speech resulted from knowledge acquired as an employee and the relationship between the speech and the employee's job. *Gibson v. Kilpatrick*, 773 F.3d 661, 667–68, 670 (5th Cir. 2014).

An employee who speaks to listeners outside the employee's organization about issues unrelated to her job duties generally speaks as a citizen. *See Anderson*, 845 F.3d at 587–88, 598 (holding that a law clerk's complaint about a judge to a separate court and an external disciplinary board was protected); *Cutler v. Stephen F. Austin State Univ.*, 767 F.3d 462, 473 (5th Cir. 2014) (holding that a letter to a member of Congress about an event outside the scope of the employee's job requirements was protected); *Charles v. Grief*, 522 F.3d 508, 514 (5th Cir. 2008) (holding that emails to state legislators with only oversight authority over employee's workplace were protected). In contrast, complaints made to those within the speaker's organization about workplace matters are usually unprotected. *See Corn*, 954 F.3d at 277 (holding that job-related communications up the chain of command were unprotected); *Williams v. Dall. Indep. Sch. Dist.*, 480 F.3d 689, 694 (5th Cir. 2007) (per curiam) (holding that memoranda about daily job operations to a superior were unprotected).

The speech that is the basis for Rushing's first retaliation claim is unprotected because she made it as a CPS employee and not as a citizen. The speech was made possible only because of information that she learned on the job. And unlike employees who disseminate information to parties outside their workplace, *see, e.g.*, *Cutler*, 767 F.3d at 473, Rushing directed her complaint to her colleague. Our cases holding employee speech to be unprotected often involve complaints up the chain-of-command and not arguments between peers. *See, e.g.*, *Johnson*, 916 F.3d at 423. But there is no meaningful difference between complaints made to a supervisor and the confrontation that Rushing had with her co-worker. The reason why complaints to supervisors are generally unprotected—because they relate to one's job—applies with equal force to work-related conversations with peers. *See Williams*, 480 F.3d at 694 (focusing on the fact that the employee's communications involved work-related issues).

The presence of the guardian ad litem does not change this conclusion. Rushing admitted that she took the ad litem to the confrontation not because she wanted to report agency wrongdoing to the outside world, but instead to prevent her words from later being "twisted around" by her supervisors. Her speech itself was directed at the co-worker, not the ad litem. *See Davis v. McKinney*, 518 F.3d 304, 315 (5th Cir. 2008) (focusing on whom the speech was directed at in analyzing whether employee spoke as a citizen). Rushing's inviting the ad litem was not a public report to an outsider.

Rushing counters that she was speaking as a citizen because confronting co-workers was not in her job description. She reasons that if the speech were part of her job description, then she would not have been disciplined for it. But this argument makes too much of her job description, which is only one of several factors used to determine whether an employee spoke as a citizen. *Garcetti*, 547 U.S. at 425 ("[T]he listing of a given task in an employee's written job description is neither necessary nor sufficient to

demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes."); *see also Foerster v. Bleess*, No. 20-20583, 2022 WL 38996, at *4 (5th Cir. Jan. 4, 2022) (unpublished) (rejecting a similar argument). Regardless of whether confronting her co-worker about alleged misdeeds was listed in Rushing's job duties, the other factors—that Rushing's speech (1) was internal, (2) addressed work-related travel, (3) and arose because of information she learned through her employment—show that she was speaking as an employee rather than a citizen. The district court correctly granted summary judgment dismissing Rushing's first retaliation claim.

B

The district court held that summary judgment was appropriate for Rushing's second retaliation claim as well. This time we see it differently.

Rushing claims that CPS demoted and transferred her to a different county in retaliation for sending the Call to Action letter.[3] This was the letter that Rushing sent to an assortment of public officials complaining about management woes and employee dissatisfaction at the agency. CPS does not dispute that the letter was protected speech. *See Cutler*, 767 F.3d at 473 (letter to a congressperson was protected); *Charles*, 522 F.3d at 514 (emails to state legislators were protected). It also accepts that the demotion and transfer was an adverse employment action. *See Burnside v. Kaelin*, 773 F.3d 624, 627–28 (5th Cir. 2014) (deeming a demotion-like transfer an adverse

---

[3] Rushing also points to several communications that she had with the judge overseeing the CPS docket, but she does not explain how those exchanges satisfy the test for protected speech. Just as we explain below in addressing Rushing's final voicemail to the judge, the remaining speech that Rushing claims CPS transferred her for was unprotected because it was not on a matter of public concern.

employment action).  It convinced the district court, however, that there was no evidence that the defendants tied the letter to Rushing.

It is true that there is no direct evidence that the supervisors knew Rushing wrote the letter; it was unsigned, and each defendant submitted an affidavit denying knowing who wrote it.  But the "law makes no distinction between direct and circumstantial evidence." Fifth Circuit Pattern Jury Instructions (Civil Cases) § 3.3 (2020); *see also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99–102 (2003) (holding that direct evidence is unnecessary in mixed-motive Title VII cases because circumstantial evidence may be "more certain, satisfying and persuasive" than direct evidence (quoting *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 508 n.17 (1957))). And here there is plenty of circumstantial evidence from which a jury could conclude that the supervisors knew who authored the letter.  *Cf. Haverda v. Hays Cnty.*, 723 F.3d 586, 589–94 (5th Cir. 2013) (concluding that circumstantial evidence was sufficient to create a genuine issue of material fact on whether sheriff demoted corrections officer because of a letter criticizing him, despite the sheriff stating that he did not know who wrote it).

Rushing sent the letter about troubles at the agency against a backdrop of several controversies involving her.  Rushing's supervisors were already "highly suspicious" that she had been leaking information about the office to outsiders.  And just as the letter complained about CPS management not showing up to work, Rushing had accused her direct supervisor of absenteeism.  *See Brady v. Hous. Indep. Sch. Dist.*, 113 F.3d 1419, 1424 (5th Cir. 1997) (noting that plaintiffs may rely on "a chronology of events from which retaliation may plausibly be inferred" (quoting *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995), *cert. denied*, 516 U.S. 1084 (1996))).  Moreover, although Rushing did not sign the letter, she asserts that she put her name and address on the envelopes.  Perhaps most compelling is the close timing between the receipt of the letter and Rushing's transfer—only a few days

transpired between the two. *See Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (concluding in a Title VII case that a five-day gap between the protected activity and the adverse employment action was close enough to infer a causal connection between the two).

Viewed in combination and in the light most favorable to Rushing, these facts are enough for a jury to find that the defendants realized that Rushing wrote the letter. Of course, a jury could find the defendants' testimony credible and conclude otherwise. But at summary judgment, credibility calls go to the plaintiff.

A fact issue on whether the defendants knew Rushing wrote the letter does not, however, necessarily get Rushing to trial. The defendants also sought summary judgment on an alternative ground: that even assuming they knew Rushing wrote the letter, they still would have transferred her because of her performance problems (most recently, her delay in responding to the rape report and her premature closing of the pregnant woman's case). In First Amendment retaliation cases, this is known as the "*Mount Healthy*" defense. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) (recognizing that a defendant prevails if it "show[s] by a preponderance of the evidence that it would have reached the same decision as to respondent's employment even in the absence of the protected conduct"); *see also Haverda*, 723 F.3d at 591–92. The district court did not address this defense in its summary judgment ruling. We may consider alternative grounds raised but not decided below but need not do so if we think the issue can benefit from initial review by the district court. *See Rutila v. Dep't of Transp.*, 12 F.4th 509, 511 n.3 (5th Cir. 2021); *Landry's, Inc. v. Insur. Co. of the State of Penn.*, 4 F.4th 366, 372 n.4 (5th Cir. 2021). That is the case for this record-intensive alternative ground on which defendant bears the burden.

No. 20-60105

We thus vacate the grant of summary judgment on this claim and remand for further proceedings including consideration of the *Mount Healthy* defense.

C

The third retaliation claim arises from Rushing's termination. Rushing argues that CPS fired her in response to (1) the voicemail that she left the judge overseeing the CPS docket and (2) the Call to Action letter. Both theories are unsuccessful.

The voicemail cannot sustain Rushing's retaliation claim because, like her earlier confrontation with the co-worker, it is not protected speech. But while the confrontation is unprotected because Rushing was not speaking as a citizen, the voicemail is unprotected because it was not on a matter of public concern.

Speech involves a matter of public concern when it is "fairly considered as relating to any matter of political, social, or other concern to the community," or involves "a subject of general interest and of value and concern to the public." *Lane*, 573 U.S. at 241 (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)); *see Salge v. Edna Indep. Sch. Dist.*, 411 F.3d 178, 186 (5th Cir. 2005) (noting that the content, form, and context of a statement should guide the public concern inquiry).

The content of Rushing's brief voicemail—information about two employees moving to other regional offices and a supervisor's possible reinstatement in her former position—conveyed nothing except internal personnel and employment issues that do not concern the public. *See Graziosi v. City of Greenville*, 775 F.3d 731, 738–39 (5th Cir. 2015) (holding that a police officer's post about attendance issues at another officer's funeral did not concern the public); *Dunbar v. Pena*, 827 F. App'x 419, 420–21 (5th Cir. 2020) (per curiam) (concluding that posting on social media about

11

potential transferees' job applications did not concern the public).  Even considering the broader context of public mistrust in the agency, Rushing's voicemail did not mention any corruption, resignations, or mismanagement that would rouse the public.  It only described rumors of personnel relocations, providing little informational value to anyone outside of the organization.

That brings us again to the Call to Action letter.  No reasonable factfinder could conclude that the termination was connected to the letter.  Unlike the close temporal link between the letter and Rushing's demotion, five months elapsed between the receipt of the letter and her firing.  *See Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 472 (5th Cir. 2002) (a five-month time lapse was alone insufficient to prove causation).  Although in *Mooney*—the unpublished case that Rushing relies on—we found causation despite the passage of three years, in that case there was evidence that the employer had tried to discipline the employee for the same speech several times before ultimately succeeding three years later.  *See Mooney v. Lafayette Cnty. Sch. Dist.*, 538 F. App'x 447, 454–55 (5th Cir. 2013).  Here, in contrast, there were multiple developments in the employment relationship unrelated to the original protected activity.  Rushing completed her stint in a different county and returned to her old office.  She then expressed her qualms to the CPS Commissioner.  And she had yet another exchange with the judge, angering her supervisors.  With these intervening events front-and-center, it is hard to see the connection between the letter and Rushing's termination.

We affirm the dismissal of this claim.

## III

Rushing raises two claims under Mississippi law: one for wrongful discharge under *McArn v. Allied Bruce-Terminix Co.*, 626 So. 2d 603 (Miss.

1993), and one under the Mississippi Whistleblower Protection Act. Neither claim is viable.

*McArn* created a public policy exception to Mississippi's at-will employment doctrine, allowing plaintiffs to bring a tort action if they were "discharged for reporting illegal acts of [their] employer to the employer or anyone else." *Id.* at 607. But neither of the two reports that Rushing points to—her confrontation with her co-worker nor her exchange with CPS Commissioner Dickinson—supports such a claim. Given the lack of connection between the letter and Rushing's firing, a causal link between the termination and the voucher incident from eight months earlier is even less plausible. *See Crawford v. Bannum Place of Tupelo*, 556 F. App'x 279, 285 (5th Cir. 2014) (per curiam) (unpublished) (providing an example of no causal connection between protected activity and termination). And Rushing's emails to the CPS Commissioner shortly before her firing reflect her personal grievances about her supervisors rather than an effort to report a crime as required by Mississippi law. *Compare Roop v. S. Pharms. Corp.*, 188 So. 3d 1179, 1187–88 (Miss. 2016) (holding that an objection stating "that's illegal" was a sufficient reporting of kickback scheme), *with Jones v. Fluor Daniel Servs. Corp.*, 959 So. 2d 1044, 1048 (Miss. 2007) (holding that plaintiffs were "merely bothered" by employer's conduct and did not intend to report illegal activity).

The Mississippi Whistleblower Protection Act allows public employees to sue employers that retaliate against them for "provid[ing] information" to any "state investigative body," including "any [] standing committee of the Legislature." Miss. Code. Ann. §§ 25-9-171, 173. Rushing argues that the letter she sent to various public officials, including "state legislators," constitutes providing information to a state investigative body. But blanketing every state legislator with a letter is not the same as sending it to a standing committee. Although committees in the Mississippi

No. 20-60105

legislature do not have independent mailing addresses, no evidence suggests that Rushing sent her letter only to a select group of legislators because of their membership in certain committees.   Indeed, there is no evidence that Rushing even knew the committees existed let alone that she directed her complaint to them.   Summary judgment was therefore appropriate on Rushing's state-law statutory claim.

* * *

We AFFIRM the district court's judgment on all claims except the First Amendment retaliation claim based on Rushing's transfer. We VACATE the summary judgment on that claim and REMAND for proceedings consistent with this opinion.